679 A.2d 121

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. KRISTINA BURRIS, A/K/A KRISTINA CAROLYN BURRIS, DEFENDANT–RESPONDENT.

Argued November 6, 1995—Decided July 24, 1996.

510

512

*Deborah C. Bartolomey,* Deputy Attorney General, argued the cause for appellant (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for respondent (*Susan L. Reisner,* Public Defender, attorney).

The opinion of the Court was delivered by

HANDLER, J.

This appeal involves the impeachment of a criminal defendant by using the defendant's incriminating statement taken in violation of her constitutional right to counsel under the Fifth Amendment and the State privilege against self-incrimination.

Defendant became a prime suspect in the murder of her mother. The police asked her to come to police headquarters for questioning, where she was given *Miranda* warnings under the Fifth Amendment and the parallel state protections of the privilege against self-incrimination. The police then interrogated her. De-

fendant gave three statements to the police. In her first statement, she denied any involvement in her mother's death. Defendant then asked for a lawyer and refused to answer any further questions. The police, however, continued questioning defendant and elicited a second and third statement, both implicating defendant in the homicide.

The second and third statements given by defendant during custodial interrogation were acquired in violation of defendant's asserted right to counsel under the Fifth Amendment and New Jersey's privilege against self-incrimination. Although those statements were not admitted in evidence for purposes of proving defendant's guilt, the trial court determined that the statements could be used on cross-examination to impeach defendant's credibility.

This case raises the issue of whether the State may use a statement obtained in violation of a defendant's right to counsel under the Fifth Amendment and the State privilege against self-incrimination for impeachment purposes.

I

On April 19, 1990, the defendant, Kristina Burris, broke into the home of her mother, Carol Burris, and shot her; Carol Burris was killed instantly. Defendant then took her mother's car and credit cards. She called up a friend and went on a shopping spree. Later that evening, Burris paid for an evening at a motel with her boyfriend, Chris Leadbeater. Burris drove the victim's car around town for several days. Not having heard from her daughter, the victim's mother, defendant's grandmother, contacted the police. On April 23, 1990, the police entered the home of the victim and found her prone body with a plastic bag over her head. Neighbors reported seeing defendant driving the victim's car the same day the police found the victim's car and defendant at Leadbeater's home.

The officers asked defendant and Leadbeater to come to police headquarters for questioning. Defendant gave three statements

to the police. In the first statement, taken after defendant was read her *Miranda* rights, defendant insisted that the car she had been driving belonged to a friend, despite the officers showing defendant evidence to the contrary. Burris claimed that she had her mother's credit cards for "a while," and that she had not seen her mother since January 1990. Defendant then asked for a lawyer, and refused to answer any further questions. Nevertheless, in response to continued interrogation, defendant gave two more statements.

Defendant gave her second statement after the police confronted her with evidence of factual inaccuracies in her first statement. In her second statement, defendant denied breaking a window at her mother's house, but admitted to knocking on the door, and entering when her mother answered. She claimed an argument ensued, and then her mother fell on the floor. The defendant recalled "yelling and getting real hot, just mad." Her mother said, "Tina," and then fell over near a grandfather clock. Defendant stated that she dragged the victim's body to a bedroom. She also admitted taking her mother's credit cards, but denied using them. She later admitted going shopping and paying for a hotel room at the Inn of the Dove with her mother's American Express card. The second statement terminated at 1:22 a.m.

Three hours later, after police told defendant that her mother had died of gunshot wounds, defendant made her third and final statement to the police. Defendant stated her mother died five days earlier, on April 19th. Burris claimed that a friend, Jay Rodriguez, picked her up from her father's house on Thursday afternoon in Delaware. While waiting for defendant to get ready, Rodriquez stole her father's handgun. She then told the police officers that when she and Rodriquez arrived at her mother's house, she entered through the front door, but Rodriguez broke in through the back window and shot her mother. Defendant stated that Rodriguez then gave her the gun and told her to return it to her father's house. Burris told police that she returned the gun on April 23rd. The third statement ended at 4:48 a.m.

The second and third statements were taken in violation of defendant's *Miranda* rights. They were, for that reason, not admitted at trial as direct evidence on the State's case-in-chief. Those statements were, however, used to impeach defendant's credibility on cross-examination.

At trial, defendant testified to another version of the story. She asserted that on April 19, 1990, Rodriguez picked her up in Delaware at her father's house and drove her to her mother's house. She testified that Rodriguez had stolen a gun from her father's home while he was there waiting for her. She stated that she took the gun away from Rodriguez and put it in her jeans. Defendant also contended that although she was delighted to see her mother, an argument ensued. Burris said that in order to change the subject of the argument, she pulled out the gun to show her mother. Defendant then testified that "somehow it went off and it hit my mom and she fell on the ground. I didn't know what happened ... [as I tried] to figure out how it went off ... it went off again and hit the wall and I dropped [the gun]." Defendant did not recall telephoning the Inn of the Dove, and denied kicking in the window at her mother's house. Nor did she remember moving her mother's body or putting bags over the body. Defendant had little recall of the weekend, but remembered being at the police station late at night with three officers yelling at her.

The State sought to use the second and third custodial statements to impeach defendant's credibility. The trial court determined that those statements were voluntary and could be used for impeachment purposes although taken in violation of defendant's constitutional rights. The court instructed the jury that the statements were not to be used as substantive evidence, but only for purposes of evaluating defendant's credibility.

The jury convicted defendant of murder, possession of a firearm for an unlawful purpose, unlawful possession of a handgun, and unlawful use of a credit card. The court sentenced defendant to an aggregate term of thirty years without parole. The Appellate

Division, concluding that the State's use of the second and third statements was impermissible, reversed the convictions for murder and possession of a firearm. We granted the State's petition for certification. 140 *N.J.* 326, 658 *A.*2d 726 (1995).

## II

### A.

■ The Fifth Amendment of the United States Constitution states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." The privilege against self incrimination is binding on the states under the Fourteenth Amendment. *Malloy v. Hogan,* 378 *U.S.* 1, 84 *S.Ct.* 1489, 12 *L.Ed.*2d 653 (1964). Although there is no direct counterpart within the New Jersey Constitution, the privilege against self-incrimination "is firmly established as part of the common law of New Jersey and has been incorporated into our Rules of Evidence." *In re Martin,* 90 *N.J.* 295, 331, 447 *A.*2d 1290 (1982) (citations omitted).

The United States Supreme Court has prescribed procedures that must be followed to assure the protection of an individual's privilege against self-incrimination under the Fifth Amendment. In *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), the Supreme Court determined that as a constitutional prerequisite to the admissibility of a statement by a suspect, he must be warned of the right to remain silent, told that any statement made may be used as evidence against him, and informed that he has a right to the presence of an attorney, either retained or appointed.

The requirements imposed under *Miranda* have been characterized as prophylactic measures that are necessary to safeguard the essential constitutional right against self-incrimination; the rights encompassed by these protective measures are ancillary to the fundamental right that is at the core of the Fifth Amendment. *Oregon v. Elstad,* 470 *U.S.* 298, 304, 105 *S.Ct.* 1285, 1290, 84

*L.Ed.*2d 222, 229 (1985). " 'The prophylactic *Miranda* warnings . . . are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." ' " *Id.* at 305, 105 *S.Ct.* at 1291, 84 *L.Ed.*2d at 229–30 (quoting *New York v. Quarles,* 467 *U.S.* 649, 654, 104 *S.Ct.* 2626, 2630, 81 *L.Ed.*2d 550, 556 (1984) (footnote omitted) (quoting *Michigan v. Tucker,* 417 *U.S.* 433, 444, 94 *S.Ct.* 2357, 2364, 41 *L.Ed.*2d 182, 193 (1974))).

 Because the *Miranda* warnings are prophylactic measures designed to ensure that a suspect's decision to speak to the police is knowing and voluntary, a *Miranda* violation itself is not determinative of a Fifth Amendment violation of the privilege against self-incrimination. *Tucker, supra,* 417 *U.S.* at 444–45, 94 *S.Ct.* at 2364, 41 *L.Ed.*2d at 193. A voluntary, incriminating statement elicited without the *Miranda* warnings violates a defendant's ancillary rights, but does not rise to the level of a constitutional violation. *Id.* at 446, 94 *S.Ct.* at 2365, 41 *L.Ed.*2d at 194. A statement that is elicited after a *Miranda* right has been invoked, however, becomes a violation of constitutional dimension—a violation of the constitutional right itself. *Wainwright v. Greenfield,* 474 *U.S.* 284, 293, 106 *S.Ct.* 634, 639, 88 *L.Ed.*2d 623, 631 (1986).

 The right to counsel is one of the prophylactic rights included among the *Miranda* protections. Unlike the right to counsel guaranteed under the Sixth Amendment, which is a constitutional right itself, Fifth Amendment rights enumerated by *Miranda,* including the right to counsel, must be affirmatively asserted by the suspect to attach and to acquire constitutional status. The United States Supreme Court, in *Edwards v. Arizona,* 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378 (1981), held that a suspect who invokes his right to counsel under *Miranda* may not thereafter be subjected to further interrogation outside the presence of counsel without violating the constitutional privilege itself, unless the suspect personally and specifically initiates the conversation. *Id.* at 484, 101 *S.Ct.* at 1884, 68 *L.Ed.*2d at 386.

■ New Jersey law governing the privilege against self-incrimination parallels the federal constitutional law. New Jersey law also distinguishes between the failure to issue the prophylactic safeguards of *Miranda* and the violation of the privilege against self-incrimination once those protective rights are asserted. *E.g., State v. McCloskey,* 90 *N.J.* 18, 27, 446 *A.*2d 1201 (1982) (holding that a failure to warn is merely a violation of *Miranda*'s prophylactic-procedural safeguards; however, a failure to honor the invoked right to remain silent is of constitutional dimension). New Jersey also recognizes that the right to counsel is one of the protective rights that surround the privilege against self-incrimination and must be included among the *Miranda* warnings. *State v. Kennedy,* 97 *N.J.* 278, 284, 478 *A.*2d 723 (1984); *see also State v. Reed,* 133 *N.J.* 237, 627 *A.*2d 630 (1993) (finding that under State privilege against self-incrimination, defendant had additional ancillary right to be informed of present availability of counsel based on presumed coercion inherent in custodial interrogation). Like the right to remain silent, once the right to counsel is invoked it assumes a constitutional status, and interrogation must cease; disregard of that claimed right violates the privilege itself. *Kennedy, supra,* 97 *N.J.* at 285, 478 *A.*2d 723.

.

### B.

■ The principle remedy for violations of constitutional rights governing the state's acquisition of incriminating evidence is the exclusionary rule. Under the federal exclusionary rule, as originally enunciated by the United States Supreme Court, the state could not use evidence obtained in violation of a defendant's Fourth and Fifth Amendment constitutional rights for any purpose. *Weeks v. United States,* 232 *U.S.* 383, 34 *S.Ct.* 341, 58 *L.Ed.* 652 (1914). New Jersey also recognizes the exclusionary rule as essential to the safeguarding of a citizen's constitutional and fundamental rights regulating the government's acquisition of incriminating evidence. *E.g., State v. Novembrino,* 105 *N.J.* 95, 145–59, 519 *A.*2d 820 (1987) (applying exclusionary rule as a

remedy required by State Constitution to evidence seized in violation of constitutional right against unreasonable search and seizure); *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986) (applying exclusionary rule to statements in violation of privilege against self-incrimination); *State v. Macri,* 39 *N.J.* 250, 265, 188 *A.*2d 389 (1963) (rejecting good faith exception to exclusionary rule: "Eyes may not be closed to the infringement of a constitutional right because the officer was well-meaning and the transgression is deemed slight").

The United States Supreme Court's exclusionary rule as originally propounded was comprehensive. It would not admit unconstitutionally acquired evidence for any reason or for any purpose or use. *See Schwartz v. Texas,* 344 *U.S.* 199, 73 *S.Ct.* 232, 97 *L.Ed.* 231 (1952); *Silverthorne Lumber Co. v. United States,* 251 *U.S.* 385, 40 *S.Ct.* 182, 64 *L.Ed.* 319 (1920); *Weeks, supra,* 232 *U.S.* at 398, 34 *S.Ct.* at 346, 58 *L.Ed.* at 658; *Boyd v. United States,* 116 *U.S.* 616, 6 *S.Ct.* 524, 29 *L.Ed.* 746 (1886). Following *Miranda,* even statements violating the prophylactic rules were excluded regardless of whether there was in fact a constitutional violation. *See Oregon v. Elstad, supra,* 470 *U.S.* at 307, 105 *S.Ct.* at 1292, 84 *L.Ed.*2d at 231 ("[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda. Thus, in the individual case, Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.").

Over time, the United States Supreme Court came to recognize an exception to the exclusionary rule relating to impeachment purposes. In *Walder v. United States,* 347 *U.S.* 62, 74 *S.Ct.* 354, 98 *L.Ed.* 503 (1954), the Supreme Court held that the state may impeach a defendant's credibility with regard to statements on collateral matters made during direct examination by using physical evidence that had been suppressed. The Court determined that although a defendant could still deny all of the elements of the case against him, the state's inability under the exclusionary

rule to use the suppressed evidence should not entitle the defendant to make perjurious statements. The Court stated:

It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

[*Id.* at 65, 74 *S.Ct.* at 356, 98 *L.Ed.* at 507.]

The Court employed a balancing test weighing the goal of the exclusionary rule—deterrence of unlawful police conduct—against the importance of arriving at the truth in criminal trials. *Ibid.; see United States v. Calandra,* 414 *U.S.* 338, 347, 94 *S.Ct.* 613, 619–20, 38 *L.Ed.*2d 561, 571 (1974) (finding "[t]he purpose of the exclusionary rule is not to redress the injury to the [defendant].... Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate [the defendant's constitutional right]"). The Court concluded that the benefit to the truth-seeking function outweighs the deterrence value that would otherwise block the admission of trustworthy evidence. *Walder, supra,* 347 *U.S.* at 65, 74 *S.Ct.* at 356, 98 *L.Ed.* at 507.

The Supreme Court solidified the impeachment exception in *Harris v. New York,* 401 *U.S.* 222, 91 *S.Ct.* 643, 28 *L.Ed.*2d 1 (1971). The statement made by the defendant after his arrest was suppressed at trial because it was obtained without warning the defendant of his right to counsel and, therefore, in violation of *Miranda*'s prophylactic rule. The Supreme Court, however, upheld the prosecution's use of the statement for impeachment purposes. The Court reasoned "[t]he shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Id.* at 226, 91 *S.Ct.* at 646, 28 *L.Ed.*2d at 5. Moreover, even though the testimony bore "more directly on the crimes charged," the Supreme Court determined that its use for impeachment purposes was consistent with the principles set forth in *Walder,* because the illegally-obtained statement directly contradicted the testimony offered at trial. It noted:

> The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby.... Every criminal defendant is privileged to testify in his own defense or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.... Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully ... and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.
>
> [*Id.* at 225, 91 *S.Ct.* at 645–46, 28 *L.Ed.*2d at 4.]

According to the Court, exclusion of such evidence from the case-in-chief provided sufficient deterrence of police misconduct. *Id.* at 225, 91 *S.Ct.* at 645, 28 *L.Ed.*2d at 4.

The Supreme Court significantly extended the impeachment exception in *Oregon v. Hass*, 420 *U.S.* 714, 723, 95 *S.Ct.* 1215, 1223, 43 *L.Ed.*2d 570, 578 (1975). There, the defendant made an inculpatory statement while en route to the police station after indicating that he wanted to phone his lawyer and being told he could do so upon arrival at the station. The Supreme Court adopted the reasoning of *Harris*. Although *Harris* involved only the failure to administer *Miranda* warnings, the *Hass* Court concluded that the exclusionary rule should not bar the use of a statement for impeachment purposes on rebuttal, even if the statement was taken in violation of the constitutional privilege against self-incrimination.

> The deterrence of the exclusionary rule, of course, lies in the necessity to give the warnings. That these warnings, in a given case, may prove to be incomplete, and therefore defective, as in Harris, does not mean that they have not served as a deterrent to the officer who is not then aware of their defect; and to the officer who is aware of the defect the full deterrence remains. The effect of inadmissibility in the Harris case and in this case is the same: inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth.
>
> [*Hass, supra*, 420 *U.S.* at 723, 95 *S.Ct.* at 1223, 43 *L.Ed.*2d at 578.]

The Supreme Court further underscored in *Hass* the ultimate truthseeking function of the criminal trial and the use of evidence that is trustworthy and not "involuntary or coerced." *Id.* at 722, 95 *S.Ct.* at 1221, 43 *L.Ed.*2d at 578. Thus, under federal law, the

impeachment exception applies not just to violations of *Miranda*'s prophylactic rules, but also to constitutional violations.

New Jersey has also adopted and employed the impeachment exception set forth in *Harris*. *E.g., State v. Irving*, 114 *N.J.* 427, 555 *A.*2d 575 (1989); *State v. Miller*, 67 *N.J.* 229, 337 *A.*2d 36 (1975); *State v. Davis*, 67 *N.J.* 222, 337 *A.*2d 33 (1975). It has, moreover, recognized and accepted the Supreme Court's use of the impeachment exception in cases involving constitutional violations, as well as *Miranda* violations of the privilege against self-incrimination. *State v. Slobodian*, 120 *N.J.Super.* 68, 293 *A.*2d 399 (App.Div.), *certif. denied*, 62 *N.J.* 77, 299 *A.*2d 75 (1972).

In *Slobodian*, the defendant shot and killed his wife. The police obtained from the defendant several statements in violation of his Fifth Amendment right to counsel. The trial court determined that the defendant had voluntarily given the statements to the police. It ruled, therefore, the statements were admissible for the limited purpose of impeaching the defendant's credibility. The unconstitutionally compelled statements were introduced on cross-examination of the defendant. The Appellate Division ruled that the admissibility of the unconstitutionality obtained evidence for impeachment purposes on cross-examination was squarely resolved in *Harris*. *Slobodian, supra*, 120 *N.J.Super.* at 74, 293 *A.*2d 399.

We note further that the impeachment exception is accepted in nearly every state in America and has been found to extend to violations of constitutional rights as well as violations of *Miranda*'s prophylactic rules. *E.g., People v. Winsett*, 153 *Ill.*2d 335, 180 *Ill.Dec.* 109, 606 *N.E.*2d 1186 (1992) (allowing impeachment use of voluntary statement despite failure to observe invoked Fifth Amendment right to counsel; basing decision on *Hass* and *Tucker*), *cert. denied*, 510 *U.S.* 831, 114 *S.Ct.* 102, 126 *L.Ed.*2d 68 (1993); *Ex parte Comer*, 591 *So.*2d 13 (Ala.1991) (allowing impeachment use of voluntary statement despite failure of police to observe the defendant's invoked right to silence); *Martinez v. United States*, 566 *A.*2d 1049 (D.C.1989) (allowing impeachment use of voluntary

statement despite failure to observe invoked right to counsel), *cert. denied*, 498 *U.S.* 1030, 111 *S.Ct.* 685, 112 *L.Ed.*2d 677 (1991); *State v. Swallow*, 405 *N.W.*2d 29 (S.D.1987) (allowing impeachment use of voluntary statement despite failure to observe invoked Sixth Amendment right to counsel); *Garrett v. Texas*, 682 *S.W.*2d 301 (Tex.Crim.App.1984) (allowing impeachment use of voluntary statement despite failure to observe invoked right to counsel; basing decision on *Hass* and *Harris*), *cert. denied*, 471 *U.S.* 1009, 105 *S.Ct.* 1876, 85 *L.Ed.*2d 168 (1985); *State v. Routhier*, 137 *Ariz.* 90, 669 *P.*2d 68 (1983) (following *Hass* by allowing impeachment use of voluntary statement despite failure to observe invoked Fifth Amendment right to counsel), *cert. denied*, 464 *U.S.* 1073, 104 *S.Ct.* 985, 79 *L.Ed.*2d 221 (1984). *But cf. State v. Santiago*, 53 *Haw.* 254, 492 *P.*2d 657 (1971) (rejecting the impeachment exception on independent state grounds).

## III

The impeachment exception is strictly limited to situations in which the suppressed statement is trustworthy and reliable in that it was given freely and voluntarily without compelling influences. *Mincey v. Arizona*, 437 *U.S.* 385, 397–98, 98 *S.Ct.* 2408, 2415, 57 *L.Ed.*2d 290, 303 (1978) (holding "[s]tatements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona, supra*, are admissible for impeachment if their 'trustworthiness ... satisfies legal standards.'") (quoting *Harris, supra*, 401 *U.S.* at 224, 91 *S.Ct.* at 645, 28 *L.Ed.*2d at 4); *Hass, supra*, 420 *U.S.* at 722, 95 *S.Ct.* at 1221, 43 *L.Ed.*2d at 578; *Slobodian, supra*, 120 *N.J.Super.* at 73, 293 *A.*2d 399. The critical issue that must be addressed in this case centers on the meaning of voluntariness as an element of trustworthiness.

The United States Supreme Court observed that a determination of whether a statement is voluntary entails a factual inquiry. It requires careful evaluation of all the circumstances of the interrogation, and, ultimately, the question is whether the defendant's will was overborne. *Mincey, supra*, 437 *U.S.* at 397–98, 98

*S.Ct.* at 2415–16, 57 *L.Ed.*2d 290. The Supreme Court has recognized that if the defendant's will was overborne, the confession is not the "product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 *U.S.* 199, 208, 80 *S.Ct.* 274, 280, 4 *L.Ed.*2d 242, 249 (1960). A confession that is not the product of such "rational intellect" and "free will" is involuntary and is violative of the Due Process Clause of the Fourteenth Amendment. *Townsend v. Sain*, 372 *U.S.* 293, 83 *S.Ct.* 745, 9 *L.Ed.*2d 770 (1963); *Reck v. Pate*, 367 *U.S.* 433, 435, 81 *S.Ct.* 1541, 1543, 6 *L.Ed.*2d 948, 950 (1961); *Brown v. Mississippi*, 297 *U.S.* 278, 56 *S.Ct.* 461, 80 *L. Ed.* 682 (1936).

 This Court has characterized statements that are obtained in violation of constitutional rights as compelled as a matter of law. *Hartley, supra*, 103 *N.J.* at 261, 511 *A.*2d 80. In *Hartley*, the Court examined whether a statement made by a defendant after the police failed to scrupulously honor the defendant's invocation of his *Miranda* rights could be admitted into evidence during the State's case-in-chief. The Court held that the statements could not be used, reasoning that the "failure scrupulously to honor a previously invoked right to silence renders unconstitutionally compelled *any* resultant incriminating statement made in response to custodial interrogation." *Ibid.* (emphasis added).[1] We must, therefore, consider whether the impeachment exception may be applied to an inculpatory statement that is deemed to have been "unconstitutionally compelled" because it was elicited after a *Miranda* right was invoked.

---

[1] The separate partial concurring and dissenting opinion commented about whether a statement elicited after the police failed to scrupulously honor a defendant's invocation of his *Miranda* rights should be characterized as compelled as a matter of law for all purposes. That opinion expressed the view that if defendant provides a voluntary statement despite the violation of the constitutional right, the statement may "constitute probative evidence for purposes other than direct proof of criminal guilt." *Hartley, supra*, 103 *N.J.* at 290, 511 *A.*2d 80 (Handler, J., concurring and dissenting in part).

New Jersey employs the due process voluntariness analysis in determining whether an unconstitutionally compelled statement may be used for impeachment purposes. In *State v. Miller,* 76 *N.J.* 392, 388 *A.*2d 218 (1978) (*Miller II*), the Court considered the requirement for voluntariness that underlies the privilege against self-incrimination. It held that the inquiry into whether a suspect's will is overborne, rendering his statement involuntary, is essentially factual:

[A] court should assess the totality of all the surrounding circumstances. It should consider the characteristics of the suspect and the details of the interrogation. Some of the relevant factors include the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.

[*Id.* at 402, 388 *A.*2d 218 (citing *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 226, 93 *S.Ct.* 2041, 2047, 36 *L. Ed.*2d 854, 862 (1973)).]

In expanding the constitutional and fundamental privilege against self-incrimination, courts have recognized as critical the distinction between statements that are involuntary as a matter of law and those that are involuntary as a matter of fact. *Miranda* recognized that determination and differentiated between involuntariness as a matter of law and involuntariness as a matter of fact. The United States Supreme Court in *Miranda* stated that "any statement taken after the person invokes his Fifth Amendment privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda, supra,* 384 *U.S.* at 474, 86 *S.Ct.* at 1628, 16 *L. Ed.*2d at 723. Nevertheless, although it noted many of the covert and subtle ways in which a defendant is coerced once in custody, the Court concluded that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Id.* at 478, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726; *cf. New Jersey v. Portash,* 440 *U.S.* 450, 99 *S.Ct.* 1292, 59 *L.Ed.*2d 501 (1979) (implying that in a given case involuntariness as a matter of law and as a matter fact can overlap; and barring impeachment use of defendant's grand jury testimony that was in fact compelled because elicited after grant of legislative immunity).

*Hartley,* as noted, described all unconstitutionally compelled statements as involuntary as a matter of law. *Hartley, supra,* 103 *N.J.* at 278, 511 *A.*2d 80. The Court explained that "the failure to honor a previously invoked [Fifth Amendment right] smacks so inherently of compulsion that any statement following that failure is *involuntary* by definition." *Ibid.* (emphasis added). However, in characterizing such statement as "involuntary," the Court did not intend to reject the distinction between statements that are involuntary as a matter of law and those that are in fact involuntary. Nor did the Court in *Hartley* intend to do away with the impeachment exception in New Jersey that is applicable to statements that are not involuntary as a matter of fact. The Court considered its ruling, including its description of unconstitutionally obtained statements as involuntary as a matter of law, to be consistent with the *Miranda* decision and the *Miranda* doctrine. *See id.* at 271–84, 511 *A.*2d 80. The Court relied primarily on federal constitutional law for its reasoning and holding.

The Court in *Hartley* perceived its understanding of the nature of the constitutional violation itself to be compatible with federal constitutional principles. It emphasized: "As for the federal law, we believe that were the questions before us squarely presented to the Supreme Court, its decision would be the same as ours. All the signposts point in that direction, and we have sought to follow them faithfully, not to write new law." *Id.* at 284, 511 *A.*2d 80. Federal law at the time clearly recognized the impeachment exception. *See Oregon v. Elstad, supra,* 470 *U.S.* at 307, 105 *S.Ct.* at 1292, 84 *L.Ed.*2d at 231; *Quarles, supra,* 467 *U.S.* at 663, 104 *S.Ct.* at 2635, 81 *L.Ed.*2d at 562; *Mincey, supra,* 437 *U.S.* at 397, 98 *S.Ct.* at 2416, 57 *L.Ed.*2d at 303; *Hass, supra,* 420 *U.S.* at 714, 95 *S.Ct.* at 1215, 43 *L.Ed.*2d at 570; *Harris, supra,* 401 *U.S.* 222, 91 *S.Ct.* 643, 28 *L.Ed.*2d 1; *see also United States v. Havens,* 446 *U.S.* 620, 100 *S.Ct.* 1912, 64 *L.Ed.*2d 559 (1980) (permitting fruits of unlawful search and seizure to be used in impeachment of a defendant on cross-examination). Significantly, the Court did not limit or distinguish *Hass.* In *Hass,* as noted, the United States Supreme Court addressed the impeachment exception and con-

cluded that statements obtained in violation of the defendant's Fifth Amendment right to counsel were admissible for impeachment purposes on cross-examination where there was no evidence or suggestion that the statements were involuntary or coerced. *Hass, supra,* 420 *U.S.* at 714, 95 *S.Ct.* at 1215, 43 *L.Ed.*2d at 570. *Hass* indicates that a statement can still be voluntary even in the face of a constitutional violation of the defendant's right to remain silent or his right to counsel and supports the distinction between coercion as a matter of law and coercion as a matter of fact. *Hartley* is not inconsistent with that principle.

We conclude that the presumption of involuntariness assigned by *Hartley* to any statement obtained in violation of a defendant's constitutional privilege against self-incrimination does not extend to a statement that was in fact freely and voluntarily given.

## IV

That understanding of the *Hartley* decision supports the conclusion that a statement given freely and voluntarily without any compelling influences after a violation of a suspect's Fifth Amendment rights and of his State rights surrounding the privilege against self-incrimination is admissible for impeachment purposes. Nevertheless, it is argued that several policy considerations militate strongly against the application of the impeachment exception to the exclusionary rule. Further, in considering whether the impeachment exception to the exclusionary rule is to be continued in light of those contentions, the standards that should govern its application are also germane.

We acknowledge that the Court cannot ignore police misconduct in obtaining evidence. *See Harris, supra,* 401 *U.S.* at 231–32, 91 *S.Ct.* at 649, 28 *L.Ed.*2d at 8–9 (Brennan, J., dissenting); *Miller, supra,* 67 *N.J.* at 238–39, 337 *A.*2d 36 (Pashman, J., dissenting). However, the concern about increased police misconduct that may follow from an impeachment exception to the exclusionary rule is highly generalized and speculative. *See Harris, supra,* 401 *U.S.* at 225, 91 *S.Ct.* at 643, 28 *L.Ed.*2d at 4 (permitting the impeach-

ment exception creates, at most, a "speculative possibility that impermissible police conduct will be encouraged thereby"). Judge Baime, in his Appellate Division concurrence in this case, observed that "[o]nly a clairvoyant officer would be able to predict that the defendant will elect to take the stand and that his testimony will deviate in some way from the custodial statement so obtained." Because the statement, if used at all, could only be brought in on cross-examination for impeachment purposes, the added deterrence of police misconduct from barring that use is minimal. *See Hass, supra,* 420 *U.S.* at 721, 95 *S.Ct.* at 1220, 43 *L.Ed.*2d at 577 (finding that "there is sufficient deterrence when the evidence in question is made unavailable to the prosecution in its case in chief").

Another argument against the impeachment exception is that it inhibits a defendant from testifying on his own behalf. *See Miller, supra,* 67 *N.J.* at 238, 337 *A.*2d 36 (Pashman, J., dissenting). The impeachment exception does not infringe on a defendant's right to testify. The right to testify comes with a reciprocal obligation to tell the truth. A defendant who testifies swears or avers to tell the truth like all other witnesses. The defendant always retains the right to testify; however, he simply is not permitted to lie without fear of contradiction. *See Nix v. Whiteside,* 475 *U.S.* 157, 173, 106 *S.Ct.* 988, 997, 89 *L.Ed.*2d 123, 138 (1986) ("Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying falsely.").

> [T]he exception leaves defendants free to testify truthfully on their own behalf; they can offer probative and exculpatory evidence to the jury without opening the door to impeachment by carefully avoiding any statements that directly contradict the suppressed evidence. The exception thus generally discourages perjured testimony without discouraging truthful testimony.
>
> [*James v. Illinois,* 493 *U.S.* 307, 314, 110 *S.Ct.* 648, 652–53, 107 *L.Ed.*2d 676, 684 (1990).]

Limiting the use of the type of evidence in question to impeachment of credibility on cross-examination ensures that such evidence will be used only should the defendant give testimony at variance with the earlier statement. Realistically, a court cannot prevent false testimony by a defendant. However, if a defendant

should falsely testify about a matter to which the State has contrary evidence, then the State need not sit idly by. Moreover, the exception will not improperly interfere with the attorney-client relation or impair an attorney's ability to develop a defense. Under New Jersey's strict ethics standards, an attorney should not devise a strategy based on false testimony. *R.P.C.* 1.2(d).

Critics point out that "[i]f the statements are irreconcilable it may indicate that the prior statement was false rather than the latter, a realistic possibility where the prior statement was made under the subtly coercive circumstances of the station house interrogation." *Miller, supra,* 67 *N.J.* at 241, 337 *A.*2d 36 (Pashman, J., dissenting). Concerns about reliability arising from involuntariness are not present here because a statement that is coerced in fact is not subject to the impeachment exception as recognized today. Moreover, a defendant is not deprived of the opportunity to explain inconsistencies in the prior statement.

 Another concern is that jurors will not use the incriminating evidence only for impeachment purposes. Thus, it has been noted that once a jury hears incriminating evidence regarding a defendant, it is extremely difficult, if not impossible, to use such evidence for impeachment purposes only. *Miller, supra,* 67 *N.J.* at 240, 337 *A.*2d 36 (Pashman, J., dissenting). Although that is a valid concern, it does not override the values that are preserved through the impeachment exception. Moreover, the Court presumes that juries will understand and abide by the court's instruction as to the correct use of evidence. *State v. Manley,* 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969). In addition, the trial court always retains the authority to deny the admission of the incriminating evidence if its probative value is substantially outweighed by the resultant prejudice. *N.J.R.E.* 403.

Critics also state that one of the most harmful effects of recognizing the impeachment exception is the impact of the exception on the public perception of the court system and judicial integrity. *See Harris, supra,* 401 *U.S.* at 232, 91 *S.Ct.* at 649, 28 *L.Ed.*2d at 8 (Brennan, J., dissenting). We cannot conclude that

the public perception of the courts will be jaundiced by the limited admission of unconstitutionally-acquired statements that are otherwise trustworthy and voluntary, and not obtained through abuse, coercion, or duress, for purposes of testing credibility and ensuring truth in the justice system. On the other hand, permitting a defendant to commit perjury while banning the use of reliable contradictory evidence would itself detract from the judiciary's stature.

It is also contended that the State already has a mechanism for discouraging defendants from taking the stand and falsely testifying. That mechanism is a perjury prosecution. Significant limitations to the perjury prosecution have been recognized. For example, the pressure to escape a present threat of prosecution is often much greater than the fear of a potential, future prosecution for perjury. That is especially true because the calculated risk of falsely testifying and being successfully prosecuted for perjury is extremely low. On the other hand, "allowing the prosecution to expose ... perjury through impeachment using illegally obtained evidence.... discourage[s defendants] in the first instance from 'affirmatively resort[ing] to perjurious testimony.'" *James v. Illinois, supra,* 493 *U.S.* at 314, 110 *S.Ct.* at 652, 107 *L.Ed.*2d at 684 (quoting *Walder, supra,* 347 *U.S.* at 65, 74 *S.Ct.* at 354, 98 *L.Ed.* at 503).

 Finally, we consider whether the use of defendant's statements for impeachment purposes violates our rules of evidence. In *Miller, supra,* 67 *N.J.* at 234, 337 *A.*2d 36, this Court concluded that "*Harris* ... is a valuable truth-finding mechanism which does not impinge on a defendant's federal or state constitutional rights. Nor do we think that Evidence Rules 25, 37 and 38 [currently *New Jersey Rules of Evidence* 503, 530, and 531] call for a different result." [2]

---

[2] *N.J.R.E.* 503 (formerly *Evid. R.* 25) states:

The Court has acknowledged the broad scope of *New Jersey Rule of Evidence* 102 (formerly *Evid. R.* 5). *Miller, supra,* 67 *N.J.* at 234, 337 *A.2d* 36. That rule, in pertinent part, states "[t]hese rules shall be construed to secure fairness in administration and elimination of unjustified expense and delay. The adoption of these rules shall not bar the growth and development of the law of evidence to the end that the *truth may be ascertained and proceedings justly determined.*" *N.J.R.E.* 102 (emphasis added). Therefore, because the impeachment exception seeks to enhance the ascertainment of the truth in the proceedings while not unduly burdening defendant's constitutional rights, it comports with the goals and purposes behind New Jersey's Rules of Evidence.

Although the reasons for adopting the impeachment exception to the exclusionary rule outweigh those that countermand its use, we acknowledge the genuine concerns that its use will engender. That consideration counsels a use of the rule that is carefully circumscribed to assure that it will not be abused.

 Like the rule permitting the introduction of a criminal defendant's prior convictions if the defendant takes the stand, *N.J.R.E.* 609, and the rule governing the introduction of prior inconsistent statements, *N.J.R.E.* 613, the rule we adopt today in permitting the impeachment of a testifying defendant through the use of a prior suppressed confession is subject to limitations. The

---

Subject to Rule 37 [Rule 530], every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate. *N.J.R.E.* 530 (formerly *Evid. R.* 37) states:

A person waives his right or privilege to refuse to disclose or to prevent another from disclosing a specified matter if he or any other person while the holder thereof has (a) contracted with anyone not to claim the right or privilege or, (b) without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone.

And finally, *N.J.R.E.* 531 (formerly *Evid. R.* 38) states:

Evidence of a statement or other disclosure is inadmissible against the holder of the privilege if the disclosure was wrongfully made or erroneously required.

previously suppressed statement must, as a fundamental prerequisite, be trustworthy. Trustworthiness entails an examination of the voluntariness of the statement. Voluntariness, in turn, depends on whether the suspect's will was overborne and whether the confession was the product of a rational intellect and a free will. *See Mincey, supra,* 437 *U.S.* at 397–98, 98 *S.Ct.* at 2415–16, 57 *L. Ed.*2d at 303; *Blackburn, supra,* 361 *U.S.* at 208, 80 *S.Ct.* at 280, 4 *L. Ed.*2d at 249. The State shoulders the burden of proving voluntariness beyond a reasonable doubt in light of all surrounding circumstances. *See State v. Gerald,* 113 *N.J.* 40, 118, 549 *A.*2d 792 (1988); *Miller II, supra,* 76 *N.J.* at 404–05, 388 *A.*2d 218.

Several factors can weigh into the factual determination of voluntariness. Among them are the circumstances of the interrogation, including the conduct of the police, the responses of the defendant, and the knowledge and condition of the defendant. *See Mincey, supra,* 437 *U.S.* at 397–98, 98 *S.Ct.* at 2415–16, 57 *L. Ed.*2d at 303. The memorialization of the statement may be a factor contributing to its reliability. *See State v. A. Gross,* 121 *N.J.* 1, 15, 577 *A.*2d 806 (1990) (listing 15 factors a court should consider in evaluating and examining reliability of prior inconsistent statements); *cf. Oregon v. Bradshaw,* 462 *U.S.* 1039, 103 *S.Ct.* 2830, 77 *L. Ed.*2d 405 (1983) (recognizing that waiver of rights protecting privilege against self-incrimination must be made knowingly, intelligently, and voluntarily); *North Carolina v. Butler,* 441 *U.S.* 369, 374–75, 99 *S.Ct.* 1755, 1757–59, 60 *L. Ed.*2d 286, 292–93 (1979) (determining that waiver need not be explicit, but may be determined based upon facts and circumstances of each case, including the background, experience, and behavior of suspect).

Even if the statement is voluntary, the statement may be excluded for impeachment purposes because it is prejudicial, cumulative, or misleading. *N.J.R.E.* 403. Evidence introduced under the impeachment exception often poses a significant danger because the information directly relates to the offense but the jury can consider it only for the purpose of evaluating the defendant's

credibility. Trial courts should be especially cautious when considering whether to permit such evidence. *Cf. State v. Brunson,* 132 *N.J.* 377, 383–93, 625 *A.*2d 1085 (1993) (holding that because prejudice is unlikely to be cured by limiting instruction, evidence of prior convictions involving similar offenses intended to be used for impeachment purposes is admissible only if sanitized and if details are limited to the degree of the crime and the date of the offense).

Trial courts may also limit the scope of the testimony. Because the testimony can be considered solely in relation to the defendant's credibility, the only relevant previous statements would be those that contradict or call into question the defendant's version of events as recounted at trial. Moreover, at some point, a defendant's credibility might become so impeached that further evidence of a prior inconsistent statement will be cumulative.

█ If the statement is admissible for purposes of impeachment only, the defendant should be informed prior to taking the stand whether the State will seek to admit the suppressed statement for impeachment purposes. A hearing may well be required to establish the voluntariness of the confession for admission under the impeachment exception. *Cf. United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L. Ed.*2d 1149 (1967) (requiring a hearing to determine whether the identification of the defendant was reliable). That hearing should ordinarily occur prior to trial, *R.* 3:9–1d, and should be undertaken as part of the *Miranda* hearing that is conducted to determine whether the statement otherwise must be suppressed.

█ Furthermore, the jury must be instructed that the prior statement is admitted for the limited purpose of impeaching the defendant's credibility and that it cannot be used as evidence of the defendant's guilt. *See Manley, supra,* 54 *N.J.* 259, 255 *A.*2d 193. The jurors should be instructed that they may, although they need not, consider the previously suppressed statement as affecting the defendant's credibility. *See State v. Knight,* 63 *N.J.* 187, 305 *A.*2d 793 (1973); *cf. State v. Hampton,* 61 *N.J.* 250, 272,

294 *A*.2d 23 (1972) (holding that even after trial court admits statement, jury must be instructed that if it does not find the statement trustworthy, the jury must disregard the statement for purposes of determining guilt or innocence).

## V

■ The final issue in this case is whether defendant's statements were voluntary and sufficiently trustworthy to be used for impeachment purposes under the exclusionary rule exception.

The record demonstrates that the defendant's will was not overborne. The entire interview with the detectives was tape recorded, and in no portion of the tape or transcript does it appear that the officers deceived, coerced, or in any way overcame defendant's will.

As already noted, Kristina Burris gave three statements to the police while in custody on the night of April 23 to 24, 1990. The State introduced the first statement in its case-in-chief and also used the first statement to impeach Burris. The second and third statements were introduced by the State on cross-examination of Burris, to impeach her testimony.

The summary of the circumstances surrounding those statements may be recapitulated. Burris was at her boyfriend's home on the evening of April 23. Her mother's car was parked outside. At about 10:00 p.m., Detectives Price and Kelly came to the house and requested that Burris and her boyfriend come to the station for questioning. They agreed. Burris's first statement commenced at 11:43 p.m. Detective Wright advised Burris of her *Miranda* rights. Burris indicated that she understood and waived her rights. Detective Wright and Detective Kelly proceeded to question Burris about the events of the prior weekend. During this interrogation, Burris claimed that she had been driving her girlfriend's car, not her mother's car. She also claimed that she had received her mother's credit cards, which were in defendant's possession, in January of 1990. Burris stated that she had not used the credit cards. After about twenty minutes of questioning,

Detective Wright told Burris that he believed she was lying. He also suggested that Burris may have killed her mother. Burris then indicated she wanted a lawyer and the interrogation was stopped. The tape was turned off and the detectives left the interrogation room. Detective Wright then noticed that one of the credit cards had an issue date of March 1990, making it impossible for Burris to have received the card in January 1990.

Detective Wright went back into the interrogation room and confronted Burris with this information. Detective Wright did not turn the tape recorder on. Detective Wright testified that Burris started to cry and said that she didn't want to hurt her mother, that it was an accident, and that she wanted to tell the truth and resume her statement on tape, without an attorney present. Then, the tape was turned on. The second statement commenced at 12:25 a.m. Prior to eliciting the second statement, Detective Wright established that Burris understood her rights. Burris indicated that she wanted to go ahead and get the statement off her chest. Burris claimed that she and her mother had argued and that her mother had fallen. Burris did not mention a gun. Nor did she confess to killing her mother. Burris did, however, admit taking her mother's car and credit cards and using the car and credit cards over the weekend. Burris also renewed her request for counsel. Statement two was then terminated and the tape recorder was turned off.

After statement two ended, Burris was again left alone in the interrogation room. At some point thereafter, detectives learned from the Medical Examiner that Burris's mother had died of a gunshot wound. At approximately 2:10 a.m. (after the termination of the second taped statement and before the commencement of the third taped statement), Detectives McGough and Price entered the interrogation room and questioned Burris about her mother's death. Detective McGough testified that he assumed Burris had been given *Miranda* warnings and had waived her right to have an attorney present. Detective McGough confronted Burris with the fact that her mother had been shot. Burris

indicated a willingness to make another statement. The detectives turned the tape recorder back on. The transcript indicates that although full *Miranda* warnings were not reissued, Detective Wright did establish that Burris understood what a waiver of rights was and did know her rights. Burris said that she witnessed the shooting of her mother, and that the person who shot her mother was Jay Rodriguez. Burris claimed that she was surprised that Rodriguez shot her mother, that she had no prior knowledge the shooting would occur. Burris further stated that she had moved her mother's body after the crime. The statement concluded at 4:48 a.m. on April 24.

The trial court concluded that the statements were voluntary and ruled that they could be used to impeach Burris if she testified. We are satisfied that under the standards for determining whether a statement was involuntary as being the product of abuse, compulsion, or duress, *Mincey, supra,* 437 *U.S.* 385, 98 *S.Ct.* 2408, 57 *L. Ed.*2d 290; *Miller, supra,* 67 *N.J.* 229, 337 *A.*2d 36, defendant's statements were in fact voluntary. Moreover, there is no question that she was fully and repeatedly informed of her *Miranda* rights. Hence, defendant's statements were voluntary and trustworthy and could properly be used for impeachment purposes.

## VI

The judgment of the Appellate Division is reversed and the action is remanded to the Appellate Division for consideration of defendant's other contentions.

STEIN, J., concurring.

I write separately to express my disagreement with the Court's conclusion that defendant's second and third statements were voluntary and therefore properly used for impeachment purposes. In my view, defendant's second and third statements were not sufficiently voluntary to permit their use at trial for any purpose. However, because I conclude that the use of defendant's state-

ments for impeachment purposes constituted harmless error, I join in the judgment of the Court reversing the judgment below.

The Court observes that, under federal constitutional law, the "impeachment exception is strictly limited to situations in which the suppressed statement is trustworthy and reliable in that it was given freely and voluntarily without compelling influences." *Ante* at 525, 679 *A.*2d at 129 (citing *Mincey v. Arizona,* 437 *U.S.* 385, 397–98, 98 *S.Ct.* 2408, 2416, 57 *L. Ed.*2d 290, 303 (1978)). The Court also concludes that our decision in *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986), did not eliminate the impeachment exception in New Jersey "that is applicable to statements that are not involuntary as a matter of fact." *Ante* at 528, 679 *A.*2d at 130. Thus, the Court holds that "the presumption of involuntariness assigned by *Hartley* to any statement obtained in violation of a defendant's constitutional right does not extend to a statement that was in fact freely and voluntarily given." *Ante* at 529, 679 *A.*2d at 131. Because the Court concludes that defendant's second and third statements were in fact "voluntary and trustworthy," it holds that those statements were properly used for impeachment purposes. *Ante* at 538, 679 *A.*2d at 136.

The Court's description of defendant's statements and the circumstances of her interrogation is incomplete. Defendant gave three taped statements to the police while in custody on the night of April 23 to 24, 1990. The interrogation began shortly before midnight on April 23 and continued until nearly five o'clock in the morning on April 24. At trial, the State introduced defendant's first statement in its case-in-chief and also used that statement to impeach defendant, but conceded that defendant's second and third statements were not admissible for substantive purposes because those statements were taken in violation of defendant's right to counsel and privilege against self-incrimination. That concession was based on the following portion of defendant's first statement, during which detectives continued to question defendant despite her assertion of the right to counsel, and after which detectives resumed questioning defendant without reinforming her

of the rights available to her pursuant to *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L. Ed.*2d 694 (1966):

> DEFENDANT: Wait you said I could get a lawyer, am I getting blamed for something [ ] I didn't do.
>
> DET. WRIGHT: Do you want, do you want an attorney. Okay you have the right to an attorney. The time is 12:05 [a.m.] and I'm gonna end this statement at this time. [To Detective Kelly:] Did you have anything you would like to say.
>
> DET. KELLY: No I have nothing, no further questions.
>
> DET. WRIGHT: [To Defendant:] Do you have anything that you would like to say, anything before I end this tape that will help explain what happened tonight.
>
> DEFENDANT: No.
>
> DET. KELLY: [To Detective Wright:] One thing Jeff[.] [To Defendant:] Tina one question okay, your girlfriend, what apartment does she live at.
>
> DEFENDANT: I don't know the number it's a blue one, I don't know the number.
>
> DET. KELLY: Okay no further questions.
>
> DET. WRIGHT: Okay we're gonna terminate this statement then at 12:05.

The tape recorder was turned off and the detectives left defendant alone in the interrogation room. After a short time, Detective Wright returned to the interrogation room to confront defendant with evidence that indicated that her prior statement to detectives was not truthful. Detective Wright did not reinform defendant of her *Miranda* rights. Defendant began to cry when Detective Wright confronted her with the evidence indicating that she had lied in her prior statement. She also said that she had not intended to hurt her mother, that her mother's death was an accident, and that she wanted to tell the truth and resume her statement on tape. The tape was turned on and defendant's second statement commenced at 12:25 a.m. During that statement, Detective Wright reminded defendant that she had earlier been informed of her *Miranda* rights and that she had waived those rights. The following colloquy then took place, during which defendant repeatedly expressed a lack of understanding concerning her right to terminate the interrogation and to have an attorney present:

> DET. WRIGHT: I want you to understand that [you] still have the right to an attorney and all those other things.

DEFENDANT: Yes, I don't understand any of this, what's the difference, you know what I mean, I mean [—]

DET. WRIGHT: Well I guess [—]

DEFENDANT: If the attorney was, was here right now what would he do just sit here or [—]

DET. WRIGHT: Well he, he would have, he would have the opportunity to give you advi[c]e, now I guess, I guess what we have to determine here is you indicated to me off the tape that it is your mother's car.

DEFENDANT: Mmm-hum.

 * * * * * * * *

DET. WRIGHT: Now before we go into this further Tina, I want you to understand, that you have a right to an attorney, do you want to get it off your chest now.

DEFENDANT: I don't really cause, you know what I mean.

DET. WRIGHT: It's your decision, it's your decision.

DEFENDANT: When would an attorney be here.

DET. WRIGHT: Excuse me.

DEFENDANT: When would they be here.

DET. WRIGHT: Well that would be up to you to call an attorney of your choice.

DEFENDANT: I only know of one.

DET. WRIGHT: You're gonna have to speak up because of the tape recorder.

DEFENDANT: Oh I'm sorry.

DET. WRIGHT: You're aware I'm re-taping this.

DEFENDANT: Yeah.

 * * * * * * * *

DET. WRIGHT: I can't advise you not to get an attorney or to get an attorney, all I can tell you is that our interest in this thing is getting to the truth and all we have to go on is a scene, which is a pretty bad scene, you know that. And all we can do is from the physical evidence there is, try to determine how it happened and ah usually we're right on how it happened based on the, the scientific evidence that's obtained there and the ah blood stains and all of that kind of stuff. But what … I'd rather do is have you tell me exactly how it happened. Your mother went to work on Friday correct. You, you can't, the tape recorder can't see you shaking your head.

DEFENDANT: Yes, I'm sorry yes.

DET. WRIGHT: Okay you have to speak up. Are you willing to go ahead and do this.

DEFENDANT: I guess yeah.

That statement, defendant's second, ended at 1:22 a.m. In that statement, defendant claimed that she and her mother had argued

and that her mother had fallen. Defendant admitted that she had used her mother's credit cards and car over the weekend, but she did not confess to killing her mother.

After the second statement ended, defendant was again left alone in the interrogation room. Some time later, detectives learned that the victim had died of a gunshot wound. At approximately 2:10 a.m., Detectives McGough and Price entered the interrogation room and confronted defendant with the newly discovered information about the cause of death. The detectives did not inform defendant again of her *Miranda* rights. At 4:10 a.m., defendant agreed to make a third tape-recorded statement. In that statement, defendant again attempted to assert her right to counsel and again revealed a lack of understanding concerning the effect of her assertion of that right. The following excerpt is from that statement:

DET. WRIGHT: Now you understand that you have the right to counsel, do I have to go over all that again.

DEFENDANT: Mmm-mmm (negative).

DET. WRIGHT: Is there anything about the rights you don't understand, about remaining silent and so forth.

DEFENDANT: I still want a lawyer, a lawyer but anyway I'll do this.

DET. WRIGHT: You'll give a statement at this time.

DEFENDANT: Yes.

DET. WRIGHT: And eventually you're gonna use an attorney then.

DEFENDANT: I guess yes.

DET. WRIGHT: I would imagine you would. This is a very serious crime, we're talking about a homicide here, you know that.

DEFENDANT: Yeah.

In her third statement, defendant claimed that Jay Rodriguez had shot her mother and that defendant had moved the body after the crime. Defendant did not confess to killing her mother. The statement concluded at 4:48 a.m. on April 24.

The trial court concluded that defendant's second and third statements were voluntary and could therefore be used for impeachment purposes; the Appellate Division reversed on the ground that *Hartley, supra*, precluded the use of the statements for any purpose. While a reviewing court ordinarily defers to a

trial court's findings of fact, " 'the ultimate issue of "voluntariness" is a legal question' " requiring independent appellate determination. *Arizona v. Fulminante,* 499 *U.S.* 279, 287, 111 *S.Ct.* 1246, 1252, 113 *L. Ed.*2d 302, 316 (1991) (quoting *Miller v. Fenton,* 474 *U.S.* 104, 110, 106 *S.Ct.* 445, 449, 88 *L.Ed.*2d 405, 411 (1985)); *see State v. Tassiello,* 39 *N.J.* 282, 294, 188 *A.*2d 406 (1963). With a cursory review of the record, this Court concludes that defendant's statements were in fact voluntary and trustworthy and not the product of abuse, compulsion, or duress. *Ante* at 538–39, 679 *A.*2d at 135–36. I disagree. In New Jersey, the State must prove the admissibility of a defendant's confession beyond a reasonable doubt. *State v. Bey (II),* 112 *N.J.* 123, 134, 548 *A.*2d 887 (1988); *State v. Miller,* 76 *N.J.* 392, 404–05, 388 *A.*2d 218 (1978). Here, the State concedes that that standard of proof protects a defendant from impeachment by "any but the most freely-made statements." The inquiry concerning whether a defendant's statement is voluntary is essentially factual:

> Every case must turn on its particular facts. In determining the issue of voluntariness, and whether a suspect's will has been overborne, a court should assess the totality of all the surrounding circumstances. It should consider the characteristics of the suspect and the details of the interrogation. Some of the relevant factors include the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved. A suspect's previous encounters with the law has been mentioned as an additional relevant factor.
>
> [*Miller, supra,* 76 *N.J.* at 402, 388 *A.*2d 218 (citation omitted).]

This record reveals that detectives relentlessly questioned defendant from shortly before midnight until nearly five o'clock in the morning. During that interrogation, defendant, a twenty-one-year-old woman with no prior involvement with law enforcement, repeatedly attempted to assert her right to counsel, to no avail. Defendant's questions and comments concerning her right to counsel—"I don't understand any of this, what's the difference," "If the attorney was ... here right now what would he do just sit here," and "When would an attorney be here,"—demonstrate her lack of understanding of the constitutional right. The record suggests that, from defendant's perspective, the assertion of the

right to counsel was insignificant. The interrogation did not cease, and apparently would not cease, until the detectives had the answers they wanted.

Under those circumstances, I cannot conclude that defendant's statements were "the product of [her] free and rational choice." *Greenwald v. Wisconsin,* 390 *U.S.* 519, 521, 88 *S.Ct.* 1152, 1154, 20 *L. Ed.*2d 77, 80 (1968). " '[T]he blood of the accused is not the only hallmark of an unconstitutional inquisition.' " *Mincey, supra,* 437 *U.S.* at 401, 98 *S.Ct.* at 2418, 57 *L. Ed.*2d at 306 (quoting *Blackburn v. Alabama,* 361 *U.S.* 199, 206, 80 *S.Ct.* 274, 279, 4 *L. Ed.*2d 242, 247 (1960)). In my view, defendant's second and third statements were not sufficiently voluntary to be used at trial for any purpose. *See New Jersey v. Portash,* 440 *U.S.* 450, 459, 99 *S.Ct.* 1292, 1297, 59 *L. Ed.*2d 501, 510 (1979) (barring impeachment use of defendant's compelled statements); *Mincey, supra,* 437 *U.S.* at 401–02, 98 *S.Ct.* at 2418, 57 *L. Ed.*2d at 306 (holding that statements obtained as result of defendant's will being overborne "cannot be used in any way against a defendant at his trial"). Unlike the Court, I find it unnecessary to reach the question whether our decision in *Hartley, supra,* that statements obtained in violation of a defendant's constitutional rights are presumed involuntary and therefore barred from the State's case-in-chief, extends to the State's use of suppressed statements for impeachment purposes. The Court need not reach that question because this defendant's suppressed statements were involuntary as a matter of fact.

I also conclude that defendant's second and third statements were not sufficiently trustworthy or reliable to satisfy the limited purposes of the impeachment exception. As the Court observes, see *ante* at 530, 679 *A.*2d at 132, a fundamental policy rationale for the exception is that it

leaves defendants free to testify truthfully on their own behalf; they can offer probative and exculpatory evidence to the jury without opening the door to impeachment by carefully avoiding any statements that directly contradict the suppressed evidence. The exception thus generally discourages perjured testimony without discouraging truthful testimony.

[*James v. Illinois*, 493 *U.S.* 307, 314, 110 *S.Ct.* 648, 652–53, 107 *L. Ed.*2d 676, 684 (1990).]

That rationale for the impeachment exception necessarily assumes that the defendant's suppressed statement is truthful while the defendant's direct testimony at trial is false. Otherwise, the use of the suppressed statement to impeach the defendant's trial testimony would neither reveal nor discourage perjured testimony. The Court acknowledges as much when it declares that "[t]he previously suppressed statement must, as a fundamental prerequisite, be trustworthy." *Ante* at 533, 679 *A.*2d at 133.

However, as the Court also acknowledges, critics of the impeachment exception argue that " '[i]f the statements are irreconcilable it may indicate that the prior statement was false rather than the latter, a realistic possibility where the prior statement was made under the subtly coercive circumstances of the station house interrogation.' " *Ante* at 531, 679 *A.*2d at 132 (quoting *State v. Miller*, 67 *N.J.* 229, 241, 337 *A.*2d 36 (1975)). Curiously, the Court dismisses that criticism with a bit of circular logic, stating that "[c]oncerns about reliability arising from involuntariness are not present here because a statement that is coerced in fact is not subject to the impeachment exception," *ante* at 531, 679 *A.*2d at 132, and summarily concludes that defendant's statements were in fact "voluntary and trustworthy." *Ante* at 538, 679 *A.*2d at 136.

In view of the record, however, which plainly indicates that defendant's suppressed statements were not trustworthy, "[c]oncerns about reliability" are particularly significant. In her second statement, defendant claimed that her mother fell down during an argument and that defendant did not strike or push her or cause her to fall; in her third statement, defendant claimed that another person, Jay Rodriguez, shot her mother. Testifying in her own defense at trial, defendant admitted that she, not Rodriguez, shot her mother, but claimed that the shooting was accidental. When confronted on cross-examination with her statement that Rodriguez had shot the victim, defendant conceded that her prior statement had been fabricated. Under those circumstances, the Court's conclusion that defendant's suppressed statements were

trustworthy is unfounded. In my view, those statements were not sufficiently trustworthy to permit their use at trial for impeachment purposes. *See Mincey, supra,* 437 *U.S.* at 397–98, 98 *S.Ct.* at 2415, 57 *L. Ed.*2d at 303 ("Statements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona, supra,* are admissible for impeachment if their 'trustworthiness ... satisfies legal standards.' " (quoting *Harris v. New York,* 401 *U.S.* 222, 224, 91 *S.Ct.* 643, 645, 28 *L. Ed.*2d 1, 4 (1971))).

Although I disagree with the Court's conclusions concerning the voluntariness and reliability of defendant's second and third statements, I find that the use of those statements at trial was harmless beyond a reasonable doubt, in view of the substantial evidence of defendant's guilt. *See Fulminante, supra,* 499 *U.S.* at 295–302, 111 *S.Ct.* at 1257–61, 113 *L. Ed.*2d at 322–26 (applying harmless-error analysis to improperly admitted coerced confession); *State v. Bohuk,* 269 *N.J.Super.* 581, 595, 636 *A.*2d 105 (App.Div.) (same), *certif. denied,* 136 *N.J.* 29, 641 *A.*2d 1040, *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 183, 130 *L. Ed.*2d 117 (1994); *State v. Tucker,* 265 *N.J.Super.* 296, 328, 626 *A.*2d 1105 (App.Div. 1993) (same), *aff'd,* 137 *N.J.* 259, 645 *A.*2d 111 (1994), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 751, 130 *L. Ed.*2d 651 (1995); *see also State v. Marshall,* 123 *N.J.* 1, 121, 586 *A.*2d 85 (1991) (applying harmless-error analysis to violations of defendant's constitutional privilege against self-incrimination). Defendant testified at trial that she shot her mother accidentally; the State contended that defendant acted with purpose. Thus, the critical issue in dispute was defendant's state of mind. The State's evidence showed that, after the shooting, defendant took her mother's credit cards and car, went shopping with a friend, and spent a night in a hotel with her boyfriend. Defendant did not seek any help for her mother following the shooting. I also note that defendant's first statement to detectives, which was properly admitted at trial and used by the State for both substantive and impeachment purposes, contradicted defendant's direct testimony and itself contained a number of statements by defendant that were readily refuted by other evidence. In that statement, defen-

dant denied any knowledge of or involvement in the homicide, denied using her mother's credit cards, and denied driving her mother's car. Thus, the State's use for impeachment purposes of defendant's second and third statements merely provided cumulative evidence that defendant lied to police when questioned about the homicide.

I join in the judgment of the Court reversing the judgment below.

*For reversal and remandment*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—5.

*For concurrence*—Justice STEIN—1.

*For affirmance*—None.