**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1204-16T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

YUSUF IBRAHIM, a/k/a
YUSUT IBRAHIM, YUSEF F.
IBRAHIM, YUSIF IBRAHIM,
YUSLIF IBRAHIM, YUSUF
IBRAHAM, and YUSUF MESHAL,

     Defendant-Appellant.

_____

       Argued May 2, 2019 – Decided August 22, 2019

       Before Judges O'Connor and Whipple.

       On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 14-04-0044.

       Jay L. Wilensky, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Jay L. Wilensky and Joseph J. Russo, Deputy Public Defender, of counsel and on the briefs).

Sara M. Quigley, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sara M. Quigley, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

Following a jury trial, defendant Yusuf Ibrahim was found guilty of two counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1); two counts of second-degree desecrating human remains, N.J.S.A. 2C:22-1(a); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); two counts of third-degree theft from a person, N.J.S.A. 2C:20-2(b)(2)(d); third-degree hindering apprehension, N.J.S.A. 2C:29-3(b); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1).

The court sentenced defendant to two consecutive life sentences on the murder convictions, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The sentences imposed for the remaining charges run concurrently to those imposed for the murder convictions.

Defendant appeals from his convictions and sentence. After reviewing the record, briefs, and applicable legal principles, we affirm.

I

The key evidence adduced at trial relevant to the contentions on appeal is as follows.

Ligdalis Gonzalez, a former friend of defendant, testified that on February 4, 2013, she got into a car defendant was driving in order to ride around and "smoke." In the car were two men Gonzalez did not know. At one point, without any provocation, defendant hit one of the men with a dark object, and both men appeared "scared." Because of defendant's actions, Gonzalez got out of the car.

One of defendant's uncles, Thomas,[1] testified that on February 5, 2013, defendant telephoned him and asked that he meet defendant at Thomas's mother's house. Thomas obliged but nothing of significance occurred that day, although defendant mentioned he used a friend's car to drive to the house. The following day, however, defendant told Thomas he killed two men because they had threatened him and the family. Defendant also told Thomas he put

---

[1] We use fictitious names to refer to defendant's family members in order to protect their privacy.

the bodies in his friend's car, drove to the house, dismembered the bodies, and buried their remains in the woods behind the house.

"Horrified" by defendant's revelation, Thomas told defendant to leave. Thomas left but minutes later returned to the house and found defendant still in it. Thomas told defendant to remove the bodies from the property. Defendant said he would do so, but needed to "to dump the car first." Defendant then drove away in a white Mercedes. On February 8, 2013, the police found a burned-out Mercedes automobile in Philadelphia. It is not disputed the vehicle was owned by one of the victims and that both victims were shot in that car.

On February 7, 2013, Thomas went to a local State Police barracks and reported what defendant revealed to him. Detectives David Gosweiler and Glenn Garrels and other State troopers immediately responded to Thomas's mother's property with a dog trained in detecting cadavers. One of the police officers testified the dog scratched the ground in one particular spot in the woods. The detectives noted that on that spot there was "freshly disturbed earth" covered with "several sticks." The ground was opened, revealing two bodies without heads or hands. The dog led the police to another area where the ground, which also appeared to have been recently disturbed; in that spot the officers unearthed the missing body parts.

4

Two saws and a shovel were also found hidden nearby. The bodies of the victims were identified, and bloodstains found on the tools were consistent with their DNA profiles. The medical examiner testified the victims' bodies had been subject to gunshot wounds to the left sides of their chests at close range, and that their heads and hands were removed with a "serrated or sawtooth type of weapon."

On February 10, 2013, defendant was arrested and subsequently gave a recorded statement to the detectives, which was played in the presence of the jury. In that statement defendant stated he and the two victims use to "hang out" or "ride around" smoking marijuana. On February 4, 2013, defendant and the victims were riding in a white Mercedes, which belonged to one of the victims, when one of the victims pulled out a gun and the victims threatened to harm defendant's family members if he did not "work with them." The victims continued to make threats as the three continued to ride around in the car.

At one point, defendant managed to grab the gun from the victim and then shot and killed both victims. He went to Thomas's mother's home to bury both bodies, using tools he found in the garage to dig a grave. He cut off the victims' heads and hands with a "little hacksaw and scissors," and buried the bodies in one hole and the heads and hands in another. Because he did not

5

have a key to the house, he called Thomas, who eventually arrived and gave defendant access.[2] Defendant then showered and put his and the victims' clothes in the trunk of the Mercedes.

The following morning, Thomas began to suspect something serious had happened and "started to panic." Defendant told his uncle what he had done. Defendant then left in the Mercedes, drove to Philadelphia and, with the help of his brother, set the Mercedes on fire.

Defendant testified at trial. He claimed he and the victims were driving around and smoking marijuana the evening of February 4, 2013, when one of the victims forced defendant to get into the trunk. The victims drove to another location, where defendant heard them beat and rape a woman by the name of Fiona, who they subsequently put in the trunk with him.

After many hours, defendant was let out of the trunk and forced to drive the car. While one of the victims pointed a gun at him, defendant managed to wrestle the gun from the victim and then shot and killed both victims. Defendant maintained he shot the victims in self-defense. Defendant let Fiona out of the trunk, and they drove to Thomas's mother's house, where Fiona

---

[2] It is not clear from the record where Thomas's mother was during the subject incident.

A-1204-16T2

dismembered and defendant buried the victims' bodies. Defendant testified that after his uncle arrived, he told him that he had killed two people in self-defense and buried them in the yard. His uncle "disregarded" defendant's claim he had acted in self-defense and became very nervous. Defendant left the house, drove Fiona to Atlantic City, and then drove to Philadelphia where he and his brother burned the Mercedes.

## II

In counsel's brief, defendant raises the following points for our consideration:

> POINT I: THE DEFENDANT'S INCRIMINATORY STATEMENT WAS TAKEN IN FLAGRANT VIOLATION OF HIS FIFTH-AMENDMENT RIGHTS TO SILENCE AND TO COUNSEL, NECESSITATING SUPPRESSION. U.S. CONST., AMENDS. V, XIV; N.J. CONST, ART. 1, ¶ 10.
>
> > A. THE DEFENDANT'S RIGHTS WERE VIOLATED BY THE OFFICERS' REPEATED ASSURANCES THAT THEIR PURPOSE WAS TO "HELP" HIM AND THEIR ASSERTION THAT HE WOULD NOT BE ABLE TO SPEAK WITH AN ATTORNEY PRESENT.
> >
> > > 1. FALSE ASSURANCES BY OFFICERS.
> > >
> > > 2. THE DETECTIVES WERE ALSO DECEPTIVE CONCERNING THE RIGHT TO COUNSEL.

3.  THE DEFENDANT'S RIGHT TO COUNSEL WAS DENIED WHEN HE WAS NOT PERMITTED TO CONTACT COUNSEL.

B.  THE DEFENDANT'S ACCOUNT OF THE QUESTIONING SHOULD BE CREDITED.

C.  ADMISSION OF THE STATEMENT WAS PREJUDICIAL DESPITE THE DEFENDANT'S TESTIFYING AT TRIAL.

D.  CONCLUSION.

POINT II:  THE TRIAL COURT ERRED IN DENYING A MISTRIAL WHEN SUBSTANTIAL EVIDENCE OF A PRIOR BAD ACT THAT HAD BEEN APPROPRIATELY EXCLUDED WAS PRESENTED.

POINT III:  THE DEFENDANT WAS GREATLY PREJUDICED BY THE TRIAL COURT'S ADMISSION, IN REBUTTAL, OF EVIDENCE THAT HE HAD PREVIOUSLY ADMITTED OWNING A GUN.  (PARTIALLY RAISED BELOW).

POINT IV:  THE PROSECUTOR MISREPRESENTED FACTS AND IMPROPERLY EXPRESSED PERSONAL OPINION IN SUMMATION, NECESSITATING REVERSAL. U.S. CONST., AMEND. XIV; N.J. CONST., ART. 1, [¶¶] 9, 10.  (NOT RAISED BELOW).

A.  MISREPRESENTATION OF FACTS.

B.  EXPRESSION OF PERSONAL BELIEF.

POINT V:  REVERSAL IS NECESSITATED BY THE CUMULATION OF TRIAL ERROR.  (NOT RAISED BELOW).

POINT VI:  THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE, NECESSITATING REDUCTION.

    A. THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES.

    B. THE QUANTUM OF THE SENTENCE IS EXCESSIVE.

In his supplemental pro se brief, defendant advances the following contentions:

POINT I:  TRIAL COURT[']S FAILURE TO CHARGE THE MODEL JURY CHARGE ON PRIOR INCONSISTENT STATEMENTS WAS PLAIN ERROR DENYING THE DEFENDANT HIS RIGHT TO A FAIR TRIAL AND SHOULD ENTITLE THE DEFENDANT TO A REVERSAL OF THE CONVICTION.  (NOT RAISED BELOW).

POINT II:  DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS.  (NOT RAISED BELOW).

A

As for the first argument point asserted counsel's brief, following an evidentiary hearing, the court denied defendant's motion to suppress the statements he gave to the State Police detectives.  In his motion defendant had

9

asserted the detectives violated his Fifth Amendment[3] rights. An appellate court reviewing a motion to suppress must uphold the trial court's factual findings so long as they are supported by sufficient credible evidence in the record. State v. Elders, 192 N.J. 224, 243 (2007). However, a trial court's interpretation of the law and "the consequences that flow from established facts" are reviewed de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

The salient evidence adduced during the suppression hearing is as follows. Just hours after he was arrested, defendant was placed in an interview room of a police station. The video recorder in the interview room was malfunctioning and made only a visual recording of what occurred in the room, but one of the detectives used a digital voice recorder to record the sound. Portions of the video and audio recordings were played during the hearing. These recordings revealed that, at the outset of the interview, Detective Gosweiler read to defendant his Miranda[4] rights and defendant signed a form acknowledging his understanding of those rights.

---

[3]  U.S. Const. amend. V.

[4]  Miranda v. Arizona, 384 U.S. 436 (1966).

10

Detective Garrels then made various statements to defendant before the detectives asked him any questions. Defendant claims these statements were inappropriate. The statements were:

> We just want to hear your side of the story . . . .
>
> We – we just wanted you to get that out and tell people and have them understand why it happened.
>
> Because we're – we're – we're the ones that are backing you right now . . . . So, we – we kind of just want to just lay it on the table now and kind of, like, get through this together, right?
>
> You're not alone. We're here with you . . . .

Garrels then asked defendant if the detectives could question him, to which defendant responded "Sure." Gosweiler asked defendant a number of questions about the kinds of activities in which defendant had engaged over the previous week, how he typically spent a normal day, whether he was working, and other questions designed to elicit background information. Defendant did not answer any questions. Gosweiler then stated:

> I want you to understand something. Number – first and foremost, and we've said it before – we're here because we want to be here. We're here because you need some help right now. I basically want to be your liaison like right now . . . .
>
> I'm looking at you and I know you want to get it out.

You've been carrying it with you for awhile.
And nobody should have to carry that around that long
. . . .

[L]ike I said I'm here to help you, but I can't – I don't
– I don't even know where to start helping you if – if
you're not – you know, I need you to talk to me.

None of Gosweiler's comments induced defendant to answer any questions. After the detective's last comment, defendant mentioned he was cold and the following exchange ensued between defendant and Gosweiler:

DEFENDANT: I don't want to waste your time. I can't say anything.

DETECTIVE GOSWEILER: Huh?

DEFENDANT: I don't want to waste your time.

DETECTIVE GOSWEILER: You're not wasting my time.

DEFENDANT: But I can't say anything about it. (Inaudible).

DETECTIVE GOSWEILER: I didn't catch those last couple of words.

DEFENDANT: I said I can't figure because I'm being (inaudible) as of right now. I'm scared, that's all, and I won't give a statement.

DETECTIVE GOSWEILER: But it's your right and I respect that.

A-1204-16T2

The detectives then terminated the interview. At the suppression hearing, Garrels testified he stopped the interview because defendant had "invoked his Constitutional rights not to provide a statement at that time." Defendant was taken to a holding cell, where he remained for thirty to thirty-five minutes. The police claimed they did not talk to defendant while he was in the holding cell, other than to ask him if he wanted any food or drink, until defendant let the detectives know he wanted to speak to them.

Garrels testified he, Gosweiler, and another detective responded to the holding cell upon learning defendant wanted to speak to them. According to Garrels, defendant asked the detective what he was going to be charged with and to where he was going to be transported next. Garrels told defendant he was going to be transported to another county and that an investigation was underway. Garrels also told defendant there were "several people" the detectives wanted to speak to about the incident, including defendant's friends and family members.

Defendant then advised he wanted to give a statement about the incident, and the detectives moved him back to the interview room. Garrels testified that no one asked defendant anything related to the allegations against him

while defendant was in the holding cell, the reason why the conversation in the cell between defendant and the detectives was not recorded.

At the start of the second interview, Gosweiler read to defendant his Miranda rights and defendant indicated he understood them. Garrels then stated to defendant:

> DETECTIVE GARRELS: Yusef, before we talk to you, you were in here earlier, we talked to you. You requested an attorney.[5] That's when we stopped the interview. We brought you back in because you said you wanted to talk. You understand your rights. Do you wish to speak with us without having an attorney present?
>
> DEFENDANT: I'd still like a lawyer, but I'll talk – I'll talk to you guys, but I still want a lawyer.
>
> DETECTIVE GARRELS: All right. But we – we can't talk to you.
>
> DEFENDANT: You can't talk to me with a – with a lawyer present? You want to talk to me without a lawyer?

---

[5] During the suppression hearing, Garrels acknowledged that he misspoke at the outset of the second interview when he stated the first interview had been terminated because defendant requested counsel. At the hearing, Garrels noted defendant had in fact invoked his right to remain silent. Garrels explained he is so accustomed to terminating an interview because a defendant has asserted his right to counsel, rather than to his right to remain silent, that Garrels mistakenly stated to defendant the first interview was terminated because defendant wanted an attorney.

A-1204-16T2

DETECTIVE GARRELS:  That – that – that's your decision to exercise your rights.

DETECTIVE GOSWEILER:  That's your – we can't talk.

DETECTIVE GARRELS:  I – I can't tell you what to do.  We don't have, obviously, attorneys at the station, or anything like that.  If you request an attorney we can't speak with you – which – which is your right.  I'm not trying to talk you out of doing that.  I'm just telling you the way it is.

DETECTIVE GARRELS:  Tell us what you want to do?

DEFENDANT:  That's fine.

DETECIVE GARRELS: Do you – do you wish to speak with us?

DEFENDANT:  (No verbal response).

DETECTIVE GARRELS:  Yes or no?

DETECTIVE GOSWEILER:  We – we have to be crystal clear on this.

DEFENDANT:  I just want to make this nice and simple.

DETECTIVE GARRELS:  Let me just –just stop you.  Do you understand your rights?

DEFENDANT:  Yes, I understand my rights.

A-1204-16T2

DETECTIVE GARRELS:  Are you wishing – do you wish to speak to us without having an attorney present?

DEFENDANT:  (No verbal response).

DETECTIVE GARRELS:  You can tell me anything – I mean, you're shaking your head and –

DEFENDANT: Yes.

DETECTIVE GARRELS:  -- yes. Yes or no?

DEFENDANT:  Yes.  Yes.

DETECTIVE GARRELS:  Yes.  You're sure that's what you want to do?

DEFENDANT:  Yes.

At the suppression hearing, defense counsel conceded that for the balance of the second interview, defendant did not assert his right to remain silent or to counsel, and that the challenged portions of the two interviews were contained in the first interview and in the above excerpt from the second one.  During the remainder of the second interview, defendant answered the detectives' questions, which included inquiries about the incident to which defendant gave many incriminating answers.

Defendant testified at the suppression hearing.  He claimed that during the first interview, he not only asserted his right to remain silent, but also his

16

right to speak to an attorney. Defendant stated he listened to the audiotape of the first interview and heard himself asserting both rights. Defendant maintains that after he did so, Gosweiler stated he respected "that" and that is "your right," and took him to the holding cell.

Defendant further testified that, after he got to the holding cell, the detectives told him his family had given up on him. Upon hearing his family had abandoned him, defendant's "resistance" faded and he succumbed to answering questions asked of him by the detectives while in the cell. Defendant claimed that, during the gap period between the first and second interviews, the detectives also told him the people he cared for the most would be arrested and remain in jail until he spoke to the detectives and did so without an attorney. Defendant testified he told the detectives to charge him with murder so his relatives would not be arrested, and further told the detectives he would give the statement they wanted.

Defendant also testified he asked for the opportunity to contact an attorney numerous times while in the holding cell, but his requests were ignored. Defendant maintained he listened to a copy of an audiotape he obtained in discovery, which purported to be a copy of the audiotape that was used to record the first interview. Although he conceded the sound on the tape

is muffled, defendant claimed he could hear the detectives interrogating him while he was in the holding cell during the gap period. Defendant also provided the court with a transcript he had created of those words he claimed he could hear on the tape.

Defendant's specific legal arguments before the suppression court were that he was deprived of his right to counsel because he was not afforded the opportunity to contact an attorney after the first interview and when he made an "unambiguous request" for an attorney at the outset of the second one. He also asserted the waiver of his Miranda rights just before he was questioned at the second interview was involuntary, that such waiver was induced by the coercive statements the detectives made during the gap period.

The court denied defendant's motion to suppress the statements he made to the detectives. In its written decision, the court found Garrels was and defendant was not credible. The court analyzed the evidence and determined that the detectives "scrupulously honored defendant's invocation of the right to remain silent" by ending the first interview, defendant's rights were not violated during the gap period, and defendant's claims the detectives threatened his family during such period were unsupported by the evidence.

A-1204-16T2

The court further concluded defendant "knowingly and voluntarily waived his rights and decided to speak with the detectives" at the second interview, and "knew he could stop the interview at any time," as evidenced by his terminating the first interview and refusing to talk about certain subjects during the second one. The court also noted that when defendant made an ambiguous request for counsel at the beginning of the second interview, in response, one of the detectives made attempts to clarify whether he wished to stop the interview and obtain an attorney, or continue the interview without one. Only when defendant made it clear he wanted to proceed with the interview without an attorney did the detectives commence questioning him. The court found the detectives acted properly under the circumstances.

On appeal, defendant asserts for the first time that, during the first interview, the detectives' comments that their role was to help him and that he would benefit from providing a statement to them were so misleading that the only remedy is to suppress his statements to them. Because this contention was not raised before the trial court, the determination of whether the detectives' comments were improper must be evaluated under the plain error standard. See R. 2:10-2 ("Any error or omission shall be disregarded by the

appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . .").

In support of his argument, defendant cites State v. Puryear, 441 N.J. Super. 280, 288-301 (App. Div. 2015).  In that matter, we affirmed the trial court's suppression of a statement because a detective told the defendant, prior to reading to him his Miranda rights,"[t]he only thing you can possibly do here is help yourself out.  You cannot get yourself in any more trouble than you're already in.  You can only help yourself out here."  Id. at 288.  After the detective read his Miranda rights to him, the defendant agreed to speak with the police and provided a statement.  Id. at 289.  We found the detective's instruction "contradicted a key Miranda warning" and "was not a permissible interrogation technique" because, contrary to the detective's representation, the defendant could in fact hurt himself by giving that statement.  Id. at 298.

While we see some distinctions between what the detective stated to the defendant in Puryear and what the detectives said to defendant here, we need not make a determination about whether the subject comments made by the detectives in this matter violated the particular holding in Puryear upon which defendant relies.  The record here shows that none of the subject comments, all of which were made during the first interview, induced defendant to speak to

20

the detectives or to make any of the statements he provided during the second one.  Therefore, none of defendant's statements must be suppressed.  See State v. Pillar, 359 N.J. Super. 249, 269 (2003) ("[A] misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession."  (quoting State v. Cooper, 151 N.J. 326, 355 (1997))).

Despite the comments the detectives made during the first interview, defendant was steadfast in his obvious resolve to remain silent and to not respond to any of the detectives' questions.  In fact, after many questions were posed to him, defendant ultimately told the detectives that he did not want to waste their time, and that he "can't say anything," and "won't give a statement."  Moreover, significantly, when before the suppression court, defendant's position was not that he was induced to speak during the second interview because of any comment a detective made during the first interview, but rather because of the threats the detectives made during the gap period.

Finally, as stated, defendant failed to assert before the trial court that the detectives' comments during the first interview improperly induced him to waive his Miranda rights.  Even if defendant's statement were admitted in error, which is not the case, the admission was harmless beyond a reasonable

21

doubt, in light of the other, overwhelming evidence of defendant's guilt. See State v. Tillery, 238 N.J. 293, 302 (2019) (finding any error in the trial court's admission of the defendant's statement was harmless beyond a reasonable doubt, in light of the overwhelming evidence of defendant's guilt independent of his statement); Arizona v. Fulminante, 499 U.S. 279, 295-302 (1991) (applying harmless-error analysis to improperly admitted coerced confession); State v. Burris, 145 N.J. 509, 546 (1996) (Stein, J., concurring) (collecting cases).

We reject the remaining contentions defendant asserts in his first argument point and affirm the decision to deny his suppression motion for substantially the reasons set forth in the motion court's written decision.

B

We have considered defendant's arguments in his remaining argument points. We determine argument points two, three, four, and five of counsel's brief and point one of defendant's pro se brief lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(2).

In the second argument point of his pro se brief, defendant argues counsel provided ineffective assistance for failing to request a charge on prior inconsistent statements. Claims of ineffective assistance of counsel are

typically not reviewed on direct appeal.  See State v. Hess, 207 N.J. 123, 145 (2011) ("[W]e routinely decline to entertain ineffective-assistance-of-counsel claims on direct appeal because those claims 'involve allegations and evidence that lie outside the trial record.'"  (quoting State v. Preciose, 129 N.J. 451, 460 (1992))).  Only when the ineffective assistance claim can be determined on the trial record alone is it appropriate to dispose of the issue on direct appeal. State v. Castagna, 187 N.J. 293, 313 (2006).  That is not the case here.

C

Finally, defendant contends the imposition of two consecutive life sentences for the murder convictions was excessive.  Among other things, he argues the court erred by imposing consecutive life sentences for the two murders given the victims were killed "virtually simultaneously."  Here, the court adequately explained its reasons for imposing consecutive sentences for the two murder convictions.  Defendant's remaining arguments about his sentence are devoid of sufficient merit to warrant further discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION