NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1342-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ROBERSON BURNEY,
a/k/a ROBERT BURNEY,
JOHN BURNEY, ROBIN
BURNEY, and MICHAEL
LANGFORD,

      Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

March 31, 2022

APPELLATE DIVISION

Argued January 26, 2022 – Decided March 31, 2022

Before Judges Hoffman, Geiger, and Susswein.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Indictment No. 16-04-
1376.

Stephen W. Kirsch, Designated Counsel, argued the
cause for appellant (Joseph E. Krakora, Public
Defender, attorney; Stephen W. Kirsch, on the brief).

Lucille M. Rosano, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause
for respondent (Theodore N. Stephens II, Acting
Essex County Prosecutor, attorney; Lucille M.
Rosano, of counsel and on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Defendant appeals from his jury trial convictions for first-degree robbery, second-degree possession of a weapon for an unlawful purpose, second-degree burglary, multiple counts of fourth-degree aggravated assault with a firearm, and multiple counts of third-degree criminal restraint. He was sentenced to a mandatory term of life imprisonment without possibility of parole pursuant to New Jersey's "three strikes" law, N.J.S.A. 2C:43-7.1.

On appeal, defendant argues: (1) the trial court erred in permitting the State to use defendant's hospital-bed statements for impeachment purposes after ruling that the interrogating detectives had failed to properly administer Miranda[1] warnings; (2) the trial court erred in permitting expert testimony by an FBI agent certified in the field of historical cell phone data analysis for the purpose of establishing the approximate location of defendant's phone at the time of the armed robbery; and (3) the trial court erred in permitting a victim to make an in-court identification of defendant even though she had been unable to identify defendant in two photo array procedures and was later told

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

that photographs of her stolen watch had been extracted from defendant's cell phone.

After carefully reviewing the record in light of the applicable principles of law, we believe that the trial court did not abuse its discretion in permitting the FBI agent to testify as an expert regarding historical cell phone data analysis. Nor did the trial court abuse its discretion or otherwise commit reversible error in allowing one of the victims to make an in-court identification, or in instructing the jury on how to evaluate that identification testimony.

However, we believe the trial court's findings with respect to the trustworthiness of statements defendant made to police during his hospital-bed interrogation are inadequate to support the conclusion that those statements were made voluntarily and thus could be used for impeachment purposes if defendant elected to testify at trial. In response to police questioning, defendant offered a specific alibi that, as it turns out, would have been discredited by the historical cell phone data analysis. Defendant at the time of the interrogation was in an intensive care unit awaiting overdue dialysis. A notation in his medical chart shows that he was suffering from "toxic/metabolic derangement." Defendant's medical condition at the time of the interrogation is an important circumstance that must be carefully

considered as part of the totality of relevant circumstances in determining whether his statements to police were given voluntarily. The detectives were not qualified to make a medical judgment as to defendant's cognitive capacity. Because the hospital-bed interrogation was not electronically recorded, the trial court could not independently assess defendant's outward condition. Furthermore, the trial court candidly acknowledged in its ruling that it did not fully understand the meaning of some of the terms used in defendant's hospital chart to describe his medical condition at the time of the police interrogation. We therefore deem it necessary to remand the case for the State to present expert testimony concerning defendant's medical condition. Additionally, the trial court should make specific findings of fact and law as to the impact of that condition on the voluntariness of defendant's statements to police.

## I.

We discern the following facts from the trial record. On Christmas night, 2015, a man armed with a shotgun entered the house of Rosette Martinez in Bloomfield. Rosette[2] was with her daughter, Samantha Martinez, and her daughter's friend, Taffy Camacho. Rosette's father, who also resided in the house but was not present at the time of the home invasion, had hired a

---

[2] Because multiple witnesses and victims share the same surname, we use their first names to avoid confusion. We mean no disrespect in doing so.

contractor to repair the porch roof in October or November. Rosette recognized the intruder as one of the contractor's brothers, who had also worked on the house. Rosette testified that about two weeks prior to the home invasion, the intruder had come to the house asking for her father. Rosette also testified regarding another interaction she had with the intruder when she had spoken with him and handed him some cleaning supplies.

When Rosette answered the door on the night of the robbery, she recognized the man and asked, "what is [he] here for to fix?" The man stated, "I'm here for your dad," pulled out a gun, and ordered the three women into a bedroom while instructing them to look down and away from him. The intruder tied up the three women face down on the ground, demanded their valuables, and rifled through the house.

While the man was searching through their belongings, Rosette heard a cell phone ring; the automated voice assistant announced an incoming call or text message from a name she could not recognize. She also heard clicking noises that she inferred to be defendant taking pictures with his phone. Samantha testified that she too heard the sound of defendant taking several pictures with his phone, then heard defendant's phone audibly announce a text message from a name she did not recognize. Taffy likewise testified she heard the cell phone announce an "incoming message." Taffy also claimed she heard

"clicking sounds" which she interpreted to be the robber taking pictures with his cell phone. Taffy further testified that when she tried to look up, she saw the intruder standing near Samantha taking photographs.

The robber told them "ten minutes [was] all he need[ed]," and left shortly thereafter. The women freed each other from their bonds and immediately called 9-1-1. The 9-1-1 call was placed at around 8:15 p.m. The women testified that the home invasion took about fifteen to twenty minutes from start to finish.

In the 9-1-1 call and their trial testimony, the victims described the man as a "tall, slender," dark-skinned African American man wearing dark clothes, a black knit beanie hat, and a gold watch. Later that night, the victims were transported to the Bloomfield police station where they gave formal statements. Rosette told police that one of the items that had been stolen was a watch she had received as a gift from her mother. She described the watch as having a black band, "clear beveled rhinestones," and an inscription "Princess."

Following an investigation, in April 2016, an Essex County grand jury returned an indictment charging defendant with first-degree armed robbery, N.J.S.A. 2C:15-1; second-degree armed burglary, N.J.S.A. 2C:18-2; three counts of fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4); three

counts of third-degree criminal restraint, N.J.S.A. 2C:13-2; third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(c)(2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); third-degree burglary, N.J.S.A. 2C:18-2; and third-degree theft, N.J.S.A. 2C:20-3(a).

On June 15 and July 6, 2017, the court held hearings on defendant's pretrial motions to suppress his statements to police and to bar the testimony of the State's expert witness, Federal Bureau of Investigation (FBI) Special Agent Ajit David. With respect to defendant's suppression motion, the trial court ruled that the State failed to prove that police interrogators properly advised defendant of his <u>Miranda</u> rights. The court therefore suppressed defendant's statements from the State's case-in-chief. The court nonetheless found that defendant's statements were made voluntarily and thus could be used for impeachment purposes if defendant exercised his right to testify at trial.

With respect to the <u>Frye</u>[3] hearing, the trial court ruled that Special Agent David would be permitted to testify as an expert and that his historical cell site data analysis would be admissible for the limited purpose of providing a general approximation of defendant's geographical location at the time of the robbery.

---

[3] <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923).

On September 19, 2017, the judge denied the State's motion for reconsideration of the ruling that the State had not met its burden of proving that that <u>Miranda</u> warnings had been properly administered. The judge also granted defense counsel's motion to sever the counts for third-degree burglary and third-degree theft.

In early 2018, defendant was tried by a jury and found guilty of all counts except third-degree unlawful possession of a weapon. Defendant was sentenced on August 31, 2018. The trial judge merged the conviction for second-degree possession of a weapon for an unlawful purpose into the first-degree armed robbery conviction. On the first-degree robbery conviction, the court imposed an extended term of life imprisonment without the possibility of parole as required by N.J.S.A. 2C:43-7.1. On the second-degree armed burglary conviction, the judge imposed a ten-year prison sentence subject both to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and the Graves Act,[4] N.J.S.A. 2C:43-6(c). Defendant also received eighteen-month prison sentences with eighteen-month periods of parole ineligibility under the Graves Act for each of his three convictions for aggravated assault with a firearm.

---

[4] The Graves Act is named for Senator Francis X. Graves, Jr., who sponsored legislation in the 1980s mandating imprisonment and parole ineligibility terms for persons who committed certain offenses while armed with a firearm. The term now refers to all gun crimes that carry a mandatory minimum term of imprisonment.

The court also imposed five-year prison sentences with two-and-a-half-year periods of parole ineligibility for two of his convictions for criminal restraint, and a five-year prison sentence with an eighteen-month period of parole ineligibility for the remaining conviction for criminal restraint. All sentences were ordered to be served concurrently.

This appeal followed. Defendant raises the following contentions for our consideration:

> POINT I
>
> THE EXPERT OPINION OF AN FBI AGENT REGARDING THE COVERAGE RANGE OF CELL-PHONE TOWERS WAS: (1) IMPERMISSIBLY UNRELIABLE BECAUSE IT WAS NOT BASED UPON EVIDENCE OF THAT RANGE IN THE RECORD, BUT, RATHER, ON A GENERALIZED ASSUMPTION OF A ONE-MILE RANGE FOR THOSE TOWERS THAT THE EXPERT DID NOT JUSTIFY, AND (2) AN IMPROPER "NET OPINION."
>
> POINT II
>
> THE JUDGE INCORRECTLY DEEMED THE DEFENDANT'S STATEMENTS TO POLICE OFFICERS TO BE AVAILABLE FOR THE STATE TO USE AS IMPEACHMENT EVIDENCE IF THE DEFENDANT TESTIFIED, DESPITE THE FACT THAT THEY WERE MADE IN RESPONSE TO QUESTIONING THAT TOOK PLACE WITHOUT FULL MIRANDA WARNINGS WHILE DEFENDANT WAS CONFINED TO A HOSPITAL BED WITH MULTIPLE TUBES AND WIRES, AND HE WAS AWAITING KIDNEY DIALYSIS.

<u>POINT III</u>

THE IN-COURT IDENTIFICATION OF DEFENDANT SHOULD HAVE BEEN SUPPRESSED AS IRREPARABLY TAINTED BY SUGGESTIVE POLICE BEHAVIOR; ALTERNATIVELY, THE JURY INSTRUCTION REGARDING THAT IDENTIFICATION WAS LACKING ANY SPECIFIC REFERENCE TO THE JURY'S ABILITY TO CONSIDER THAT POLICE BEHAVIOR WHEN ASSESSING THAT IDENTIFICATION, AND ALSO MISSTATED, OR FAILED TO INCLUDE, REFERENCES TO CRITICAL FACTS RELEVANT TO THAT IDENTIFICATION.

II.

We first address defendant's contention that the trial court erred in holding that his hospital-bed statements were given voluntarily and thus could be used for impeachment purposes. We begin by briefly summarizing the relevant facts that were elicited at the suppression hearing.

Detective Jeffrey Alfonso of the Bloomfield Police Department testified that defendant and his brother Mark were scheduled to come to the police station for questioning in relation to the robbery on December 29, 2015. They failed to appear for that appointment. Detective Alfonso received a call from Mark later that day, informing him that defendant was in the hospital.

Detective Alfonso and two other detectives went to the hospital to question defendant. They arrived at the hospital around 11:40 a.m. and found

A-1342-18

defendant in the Intensive Care Unit (ICU) preparing to receive kidney dialysis. Apparently, he had missed a regularly-scheduled dialysis session and was overdue for this procedure. Defendant was connected to an intravenous line (IV)[5] and an electrocardiogram (EKG). He had not yet begun the dialysis procedure when the detectives began speaking with him.

The plainclothes detectives identified themselves and showed their badges to defendant, who was alone in the room. They asked him if he was willing to speak to them. The record does not indicate that the officers offered to postpone the interrogation until after defendant had received his impending dialysis treatment. Defendant told Detective Alfonso that Mark had informed him that the detectives wanted to talk to him. Detective Alfonso testified that defendant was willing to speak with them.

Detective Alfonso testified that another detective verbally administered Miranda warnings to defendant before they proceeded, and that defendant "indicate[d] freely that he wanted to speak" to the detectives. The Miranda waiver colloquy and ensuing interrogation was not audio- or videorecorded, even though the detectives had traveled to the hospital for the purpose of

---

[5] On cross-examination, the detectives acknowledged that IVs are used to deliver medicine or fluids. The record on appeal does not indicate the reason defendant needed an IV or what substance(s) were being injected before or during the interrogation.

interviewing defendant. Detective Alfonso also acknowledged that because neither he nor the other detectives carried written <u>Miranda</u> warning forms with them, they neither gave one to defendant to read and sign nor used a form to read the warnings verbatim. We reproduce the relevant portion of the cross-examination by defense counsel:

> Q: What did [the other detective] say?
>
> A: [The other Detective] said, "[y]ou have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to an attorney. If you cannot afford one, one will be appointed to you. You have the right to stop answering questions at any time and request a lawyer," something to that nature.
>
> Q: Something — so you don't remember the precise words.
>
> A: I don't remember the exact words.

We also reproduce the questions posed by the judge and the detective's answers:

> Q: And how were those <u>Miranda</u> warnings read to [defendant]?
>
> A: Verbally.
>
> Q: Did he use — did he have the assistance of any card or any form — any sheet when he read them to him?
>
> A: No.

Q: Do you know the specific warnings that were read to him?

A: What I stated earlier on the record.

Q: You indicated it was something to that effect, you don't know the exact words.

A: I can't recall the exact words.

Q: Do you know the specific rights that were read to him?

A: Yes.

Q: And what were they?

A: That he had the right to an attorney, that he — he has a right to an attorney and [to] stop answering [questions] at any time, and he doesn't have to speak. He can refuse to answer questions.

It appears from the Detective's response to the judge's questions that defendant was not properly advised that anything he said could be used against him in court, that he had the right to have an attorney with him during questioning, and that if he could not afford an attorney, one would be appointed for him by the court.

Near the outset of the questioning, the detectives asked defendant as to his whereabouts on the night of the robbery. In response, defendant placed a telephone call to an acquaintance named "Daquan." After the call, defendant

13

told the detectives that he had been at a specific address on Summit Avenue in Newark.[6]

After defendant used his cell phone to call Daquan, Detective Alfonso used his police-issued phone to send a text message, "Hello," to defendant's phone. Approximately one minute later, defendant's phone gave an audible voice announcement of a "message received by [Detective Alfonso's phone number]," and then announced, "Hello."[7] Defendant at that point invoked his right to remain silent and questioning immediately ceased. The detectives then obtained a telephonic arrest warrant, and once defendant was discharged from the hospital at around 4:50 p.m., the detectives escorted him to the police station.

On July 6, 2017, the trial judge determined, based on Detective Alfonso's testimony, that defendant had not knowingly and intelligently waived his Miranda rights because "he wasn't administered all of his rights."

---

[6] The State sought to introduce this statement at trial to be considered in conjunction with Agent David's expert testimony. Agent David's cell-tower analysis indicated that defendant was near the site of the robbery and nowhere near the address on Summit Avenue.

[7] The text message announcement made by defendant's cell phone in the ICU room closely mirrored the description that had been given by the robbery victims of the automated announcement made by the perpetrator's cell phone during the course of the robbery.

Accordingly, the judge suppressed defendant's hospital statements for use in the State's case-in-chief. The judge further ruled, however, that defendant's statements were made voluntarily and thus could be used for impeachment purposes should defendant take the witness stand. Defendant ultimately declined to testify in accordance with defense counsel's advice that his testimony would be subject to impeachment by the statements given to police at the hospital, i.e., the discredited alibi.

We begin our analysis by acknowledging the applicable legal principles. When reviewing the denial of a motion to suppress a statement, we apply a deferential standard of review to the trial court's findings of fact. State v. S.S., 229 N.J. 360, 379 (2017). We accept the trial court's factual findings unless they are not supported by sufficient credible evidence in the record. Id. at 381 (citing State v. Gamble, 218 N.J. 412, 424 (2014)). In contrast, we review the trial court's legal conclusions de novo. Id. at 381. Accordingly, we are not bound by a trial court's interpretations of the legal consequences that flow from established facts. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); State v. Harris, 457 N.J. Super. 34, 43–44 (App. Div. 2018).

Turning to the substantive constitutional principles pertinent to this appeal, "[t]he right against self-incrimination is guaranteed by the Fifth

Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381–82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)); see also State v. Sims, __ N.J. __, __ (2022) (slip op. at 24). As our Supreme Court recently reiterated in Sims, "[t]he privilege against self-incrimination, as set forth in the Fifth Amendment to the United States Constitution, is one of the most important protections of the criminal law." __ N.J. at __ (slip op. at 23–24) (quoting State v. Presha, 163 N.J. 304, 312 (2000)). The Court explained that New Jersey law "maintains 'an unyielding commitment to ensure the proper admissibility of confessions.'" Id. at 24 (quoting State v. Vincenty, 237 N.J. 122, 132 (2019)).

In Miranda, the United States Supreme Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically triggering the Fifth Amendment privilege against self-incrimination." State v. P.Z., 152 N.J. 86, 102 (1997) (citing Miranda, 384 U.S. at 436). Consequently,

> when a person in police custody is questioned by law enforcement, he [or she] must be told that he [or she] has the right to remain silent, that any statement he [or she] makes may be used against him [or her], that he [or she] has the right to an attorney, and that if he [or she] cannot afford an attorney, one will be provided for him [or her].

[Ibid. (citing Miranda, 384 U.S. at 444).]

As the New Jersey Supreme Court explained in State v. Tillery, "Miranda imposes a fifth requirement: 'that a person must be told that he [or she] can exercise his [or her] rights at any time during the interrogation.'" 238 N.J. 293, 315 (2019) (quoting Miranda, 384 U.S. at 479).

The New Jersey Supreme Court affords interrogees additional rights beyond those guaranteed under federal constitutional law. In Vincenty, our Supreme Court recently reaffirmed that "the [New Jersey] 'common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege.'" 237 N.J. at 132 (quoting In re Grand Jury Proc. of Guarino, 104 N.J. 218, 229 (1986)). The Court added,

> [w]e have provided that protection because the right against self-incrimination is "an integral thread in the fabric of [the] common law," and "one of the most important protections of the criminal law[.]" Accordingly, we maintain "an unyielding commitment to ensure the proper admissibility of confessions."
>
> [Ibid. (first quoting State v. Hartley, 103 N.J. 252, 286 (1986); then quoting Presha, 163 N.J. at 312; and then quoting State v. Reed, 133 N.J. 237, 252 (1993)).]

Accordingly, our review of police-obtained statements is "searching and critical" to ensure protection of a defendant's constitutional rights. State v. Patton, 362 N.J. Super. 16, 43 (App. Div. 2003) (quoting State v. Pickles, 46 N.J. 542, 577 (1966)).

17

In P.Z., our Supreme Court explained that although "Miranda established a per se rule to counteract the inherently coercive nature of custodial interrogations by law enforcement[,] it did not eliminate the due process requirement that all statements given during an interrogation must be voluntary." 152 N.J. at 113 (citing Miller v. Fenton, 474 U.S. 104, 109–10 (1985)). Applying a "totality of the circumstances" analysis, both federal and New Jersey precedents require reviewing courts to consider whether the defendant's statements were "the product of an essentially free and unconstrained choice by [the defendant]," or instead "whether the defendant's 'will [was] overborne and his [or her] capacity for self-determination critically impaired.'" Ibid. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973)); see also State v. A.M., 237 N.J. 384, 398 (2019) (quoting State v. Miller, 76 N.J. 392, 402 (1978)) (listing relevant factors that should be considered as part of the totality of the circumstances analysis).

It also is well-established that while a statement taken in violation of Miranda's strictures is automatically inadmissible in the State's case-in-chief, such a statement may nonetheless be admissible for the limited purpose of impeaching a defendant's testimony. State v. Burris, 145 N.J. 509, 535 (1996). Before admission for that purpose, however, the statement must be found to be trustworthy. Id. at 533–34. "Trustworthiness entails an examination of the

voluntariness of the statement. Voluntariness, in turn, depends on whether the suspect's will was overborne and whether the confession was the product of a rational intellect and a free will." Id. at 534.

Determination of whether a statement is voluntary requires careful evaluation of all the factual circumstances of the interrogation. Id. at 525. Thus, "the inquiry into whether a suspect's will is overborne, rendering his [or her] statement involuntary, is essentially factual." Id. at 527 (citing Miller, 76 N.J. at 402). Courts are to assess the totality of all relevant factors, including "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated or prolonged in nature[,] and whether physical punishment or mental exhaustion was involved." Ibid. (quoting Miller, 76 N.J. at 402). Importantly for purposes of this appeal, for the statement to be admissible, the court must find it was voluntary beyond a reasonable doubt. Miller, 76 N.J. at 404–05.

In the present matter, the trial judge credited the detectives' testimony that "defendant was not in distress" at the time of interrogation. The judge also found defendant was able to answer the officers' questions, was not in physical pain while being questioned, and that the officers did not threaten or attempt to coerce defendant.

19

The judge also reasoned that during the interrogation, defendant gave the officers a false alibi, "which show[ed] that he was very cognizant of the fact that he was a suspect and didn't make any admissions to put himself [in] what he believed to be in jeopardy." The judge thus concluded, notwithstanding the circumstance that defendant was receiving medical treatment at the time of questioning, the other factors indicated that defendant did not make his statement involuntarily.

We are not persuaded, however, that the judge adequately considered all of the information in the record concerning defendant's medical condition. Defense counsel and the prosecutor stipulated to admission of a hospital report. That report shows that on the day of admission, defendant suffered from "shortness of breath . . . and [localized] right side chest pain," "[f]luid overload," "[a]nemia, electrolyte abnormality[,] and . . . toxic/metabolic derangement." The trial judge candidly acknowledged that he did not have the benefit of an expert medical witness to explain the medical terms in the hospital report. He nonetheless declined to find that defendant "was in distress."

The judge's reference to "distress" was, in our view, imprecise. The judge drew no distinction between physical and mental distress, or between

20

distress caused by defendant's medical condition as distinct from distress caused by police questioning in an ICU room.

Significantly, the judge acknowledged that he had no basis upon which to determine the symptoms and impact of toxic/metabolic derangement. The judge stated:

> I'm not a medical doctor and I—I don't know—medical terminology, [and] very often, [it] means things very different than—than legal or layman terminology, so I don't place any strong emphasis on the word toxic . . . metabolic derangement. It could mean something very different from this.
>
> [(Emphases added).]

Indeed, the record shows that both defense counsel and the judge acknowledged that they could not fully appreciate the meaning of several terms in the hospital report, such as EF (ejection fraction), PNA, and toxic/metabolic derangement.[8]

As we have noted, judicial review of the circumstances of a custodial interrogation must be "searching and critical" to ensure protection of a

---

[8] Mindful that important constitutional rights are at stake in this litigation, we have resisted the temptation to go beyond the record and consult a medical dictionary or similar resource to gain a better understanding of "toxic metabolic derangement." We are convinced that the nature of defendant's medical condition at the time of the police interrogation, as documented by health care professionals in his hospital chart, is a matter that requires the assistance of expert opinion, not superficial speculation by lawyers or judges based on a dictionary entry.

defendant's constitutional rights.  See Patton, 362 N.J. Super. at 43 (quoting Pickles, 46 N.J. at 577).  We add that the proof-beyond-a-reasonable-doubt standard for determining voluntariness cannot be met in the unusual circumstances of this interrogation unless the trial court's findings are based on a more complete understanding of the potential impact of defendant's medical condition on his physical and mental capacity to overcome the inherent coerciveness of a police interrogation conducted while defendant was in a hospital bed, connected to an IV.

We also believe the lay opinion of the interrogating detectives as to defendant's apparent condition is not an adequate substitute for expert testimony to explain the significance of toxic/metabolic derangement and its possible impact on defendant's cognitive function.  That is especially true because, as we have noted, the interrogation was not electronically recorded. Cf. R. 3:17 (generally requiring electronic recordation of custodial interrogations conducted "in a place of detention").  We emphasize that our concern is not just with the inherent coercion of an interrogation of a person confined to a hospital bed, connected to a drip line and heart monitor.  The fact-sensitive issue that was not adequately explored at the suppression hearing was whether and to what extent the underlying acute medical condition that precipitated defendant's admission to the ICU impacted his capacity for self-

22

determination.  See P.Z., 152 N.J. at 113 (discussing whether the interrogee's "capacity for self-determination was critically impaired").

In these circumstances, we deem it both necessary and prudent to remand for a new suppression hearing at which the State shall bear the burden to present expert medical testimony concerning defendant's condition at the time of the interrogation.  The court shall make findings of fact concerning that medical condition and shall reevaluate the totality of relevant circumstances bearing on voluntariness, accounting for defendant's physical and mental condition.  The trial court shall make findings of fact and law in sufficient detail to permit appellate review if needed.  If the court determines on remand that defendant's statements were not made voluntarily, the court shall suppress defendant's statement, vacate the convictions, and order a new trial.

We reject the State's alternative argument on appeal that even if the trial court erred in permitting the statements to be used for impeachment purposes, that error was harmless.  The record clearly shows that defendant's attorney counselled him to waive his right to testify at trial because testifying would subject him to impeachment by his otherwise inadmissible statements given to police at the hospital.  Exercising the right to testify in this case would have

A-1342-18

revealed to the jury that defendant provided a false alibi to police, which would show a consciousness of guilt.

We do not hesitate to conclude that, in these circumstances, the trial court's ruling to allow defendant's statements to be admitted for impeachment purposes significantly impacted defendant's decision to waive his right to testify on his own behalf. We note that in State v. Whitehead, a case addressing the use of the defendant's prior convictions for impeachment purposes, the Court explained, "[i]n this regard, the United States Supreme Court has stated that almost any error [allowing otherwise inadmissible evidence to be admitted for impeachment purposes] would result in automatic reversal because 'the appellate court could not logically term "harmless" an error that presumptively kept the defendant from testifying.'" 104 N.J. 353, 359 (1986) (quoting Luce v. United States, 469 U.S. 38, 42 (1984)). Here, we are satisfied that the decision to allow defendant's hospital-bed statements to be used for impeachment purposes contributed to his decision to eschew the right to testify in his own defense.[9] Accordingly, if, considering the totality of the relevant circumstances on remand, the trial court determines that the State

_____

[9] We recognize that other factors may have influenced defendant's decision not to testify, including his criminal record, which also could be used to impeach his credibility as a trial witness. We nonetheless decline to hold that any error with regard to the finding that his hospital-bed statements were voluntary was harmless beyond a reasonable doubt.

has failed to prove beyond a reasonable doubt that defendant's admissions were voluntary and thus could be used for impeachment purposes, defendant's convictions must be reversed, and he must be granted a new trial. We offer no opinion on whether defendant's statements were made voluntarily accounting for all relevant circumstances, which include but are not limited to (1) his medical condition at the time of the police interrogation; (2) his willingness to speak with the detectives; (3) his outward ability to communicate rationally; (4) his ability to proffer a specific alibi address; (5) his ability to appreciate the need to terminate the interrogation immediately after the detective sent him a text message, triggering the distinctive announcement feature of his cell phone; (6) the inherent coerciveness of an interrogation conducted while he was confined to an ICU hospital bed, connected to an IV and EKG; and (7) the failure by detectives to properly administer Miranda warnings, which are "employed to dispel the compulsion inherent in custodial surroundings[.]" Miranda, 384 U.S. at 458.

## III.

We turn next to defendant's contention that the trial court erred in admitting Special Agent David's expert testimony. At the conclusion of the Frye hearing, the trial judge permitted Special Agent David to testify as to the coverage area of the specific cell tower sector that defendant's cellphone

"pinged" when it received a text message at 8:02 p.m. on December 25, 2015. More specifically, he testified that the cell tower sector that pinged defendant's cell phone at the time of that text had an approximate one-mile radius area that either covered or came very close to the victims' home in Bloomfield. The agent's expert testimony was admitted for the limited purpose of providing a general approximation of defendant's geographical location at the time of the robbery, not to pinpoint it with specificity.

Defendant contends there was no evidence to support Special Agent David's estimation that the cell tower's range was approximately one mile in radius, and that his testimony constituted an impermissible net opinion. We disagree. The record shows that Special Agent David's estimate of a one-mile range of coverage was well-supported by his knowledge, skill, experience, and training, as well as by the Relevant Locations maps included in his expert report. It was for the jury to decide whether his testimony was credible and how much weight to give it.

The scope of our review of expert testimony rulings is limited. "Ordinarily, the necessity for and admissibility of expert testimony are matters to be determined within the sound discretion by the trial court." State v. Berry, 140 N.J. 280, 293 (1995) (citing State v. Zola, 112 N.J. 384, 414 (1988)); see also State v. Kelly, 97 N.J. 178, 216 (1984) (citations omitted) (noting

generally that "[i]n the context of an appellate review, a decision of the trial court [regarding admissibility of expert testimony] must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted").

N.J.R.E. 702 provides, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." There are three prerequisites for the admission of expert testimony: first, "the intended testimony must concern a subject matter that is beyond the ken of the average juror"; second, "the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable"; and third, "the witness must have sufficient expertise to offer the intended testimony." State v. Jenewicz, 193 N.J. 440, 454 (2008) (quoting Kelly, 97 N.J. at 208). "Those requirements are construed liberally in light of [N.J.R.E.] 702's tilt in favor of the admissibility of expert testimony." Ibid. (citing Berry, 140 N.J. at 290–93).

Furthermore, an expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Davis v. Brickman Landscaping, 219 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Comm.

27

Corp., 207 N.J. 344, 372 (2011)). A conclusion unsupported by facts or reliable data is a "net opinion" that must be excluded. Pomerantz Paper Corp., 207 N.J. at 372. "[A]n expert offers an inadmissible net opinion if he or she 'cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is personal.'" Davis, 219 N.J. at 410. "Therefore, [t]he net opinion rule appears to be a mere restatement of the established rule that an expert's bare conclusions, unsupported by factual evidence, [are] inadmissible." Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997) (alteration in original) (internal quotation marks omitted) (quoting Buckelew v. Grossbard, 87 N.J. 512, 524 (1981)).

In interpreting the information provided by the cellphone carrier—call detail records and per call measurement data (PCMD)—Agent David testified that he could generate a generally reliable estimate of a cellphone's location at the time of access. The gravamen of Special Agent David's testimony was that at 8:02 p.m. of the night of the robbery, a text message caused defendant's phone to "ping" off the same cell tower sector that was also oriented toward the site of the robbery, thus suggesting that defendant was approximately within one mile of that area at that time.[10]

---

[10] As we have noted, this testimony would also have discredited the alibi address that defendant provided to police during the hospital-bed interrogation.

The "Relevant Locations" maps in the PowerPoint Special Agent David presented to the jury clearly indicate that most towers in that area were approximately one mile or further apart. Accordingly, his testimony was well-supported by factual evidence in the record.

Furthermore, defendant's arguments concerning the assumptions Special Agent David made in reaching his conclusion speak to the weight of the evidence, not its admissibility. See United States v. Jones, 918 F. Supp. 2d 1, 5 (D.D.C. 2013) (accepting the government's use of an expert in historical cell site data analysis for similar location estimation and holding "to the extent that [the expert's] testimony relies on assumptions about the strength of the signal from a given cell tower, any challenges to those assumptions go to the weight of [that expert's] testimony, not its reliability."). We add that the jury was properly instructed that it was to determine the credibility of the expert testimony.[11]

---

[11]  The trial judge instructed the jury as follows:

> You are not bound by [the] expert[]s['] opinion, but you should consider each opinion and give it the weight to which you deem it entitled, whether that weight be great or slight, or you may reject it. In examining each opinion[,] you should consider the reasons given for it, if any, and you may also consider the qualifications and credibility of the expert. It is always within the special function of the jury to

In these circumstances, we conclude the trial court did not abuse its discretion in admitting Special Agent David's expert testimony for the limited purpose of using historical cell site data analysis to give a general approximation of defendant's location at the time of the robbery.

IV.

Finally, we address defendant's contention that the trial court erred by permitting Rosette to make an in-court identification of defendant, and by declining to instruct the jury that a detective had tainted Rosette's memory by mentioning defendant's name when discussing a photograph defendant had taken of Rosette's stolen watch.

---

determine whether the facts on which the answer or testimony of an expert is based actually exists.

The value or weight of the opinion of the expert is dependent upon and is no stronger than the facts upon which it is based. In other words, the probative value of the opinion will depend upon whether from all the evidence in the case you find that those facts are true. You may, in fact, determine from the evidence in the case that the facts that form the basis of the opinion are true, are not true, or are true in part only. And in light of such findings, you should decide what effect such determination has upon the weight to be given to the opinion of the expert.

Your acceptance or rejection of the expert opinion will depend, therefore, to some extent on your findings as to the truth of the facts relied upon.

A-1342-18

## A.

We begin our analysis by recounting the circumstances of the out-of-court identification procedures that were conducted in this case. Rosette was shown two sets of photo arrays, one on December 26, and one on December 28, 2015. She did not make a selection during the first session. During the second photo array session, Rosette noted that photograph "number five"—a three-year-old photo of defendant—was a possibility "[be]cause of his eyes," but ultimately, she again declined to make a selection.

After obtaining a communications data warrant (CDW), police recovered several photographs of a watch that were stored in defendant's cell phone. Defendant's cell phone contained four photographs of the same watch: three were taken at 8:03 p.m. on December 25, 2015—at the same time as the robbery—and one was taken at 6:48 p.m. on December 26, 2015.

On January 21, 2016, Rosette returned to the police station and identified her watch in the photographs that had been extracted from defendant's cellphone. At that time, Detective Alfonso informed Rosette that they had arrested defendant—naming him—and that the photographs of the watch were from his cell phone. She later brought the original watch box and additional watch bands to the police station to corroborate her ownership of the watch.

31

The trial judge denied defendant's motion to bar Rosette from making an in-court identification of defendant. The court reasoned that defense counsel's concerns as to inconsistency and the suggestiveness of police behavior could be addressed through cross-examination and model jury charges.

At trial, Rosette made a positive in-court identification of defendant as the perpetrator. During cross-examination, she admitted she previously had been presented with two photo arrays but was unsure and did not select a photo during either photo array session. Rosette also testified that her conclusion that defendant was the robber was based on her recognizing her watch and being informed by Detective Alfonso that the pictures of that watch came from defendant's phone.

At the beginning of cross-examination, defense counsel renewed his request for a more specific jury charge that would highlight Rosette's failure to make a positive out-of-court identification and that her subsequent in-court identification was based on the information that was provided to her by police. The judge advised the jury that they were the ultimate factfinders as to Rosette's in-court identification in light of her previous inability to identify defendant in either photo array. The judge also informed the jury that he would remind them of this again in his final jury instruction at the end of the trial.

After both sides rested, defense counsel proposed changes to the model jury instruction on in-court identification, seeking to highlight in three separate portions of that charge Rosette's failure to make an out-of-court identification and the time elapsed between the robbery and trial. The court declined defendant's suggestion to make repeated mention of the lack of out-of-court identification, citing concern that any such repetition was unnecessary and would convey a judicial bias for one side. However, the court agreed to instruct the jury that Rosette identified defendant at trial on February 12, 2018, and that she did not identify him during the photo array procedure on December 28, 2015.[12]

During closing argument, defense counsel emphasized that Rosette had not made a previous out-of-court identification, that the first time she

[12] We note that defense counsel did not make a request for the trial court to instruct the jury on the inherent suggestibility of in-court identifications. Rather, the gravamen of defendant's argument at trial and on appeal focuses on police conduct prior to the in-court identification. Defendant does not contend that in-court identifications are inherently suggestive. Indeed, in his appeal brief, defendant explicitly acknowledges that "there is no need for the [c]ourt to address the broader question of the more general suggestiveness of all (or at least many) in-court identifications whenever the victim identifies the defendant in court, but not out of court." We therefore decline to address the inherent suggestibility of in-court identifications at this time. Cf. N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 504 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal."); State v. Guerino, 464 N.J. Super. 589, 613–14 (App. Div. 2020) (declining to eliminate in-court identifications, noting the record failed to provide adequate scientific evidence concerning the validity and utility of this familiar practice).

identified defendant was in-court, and that her in-court identification was premised upon her deduction from the information provided by police that the photographs of her watch had been recovered from defendant's cell phone.

B.

In State v. Henderson, the New Jersey Supreme Court re-examined our jurisprudence regarding eyewitness identifications. 208 N.J. 208 (2011). Chief Justice Rabner's unanimous opinion was supported by social science studies compiled by a Special Master appointed by the Court. Id. at 217–18. The landmark decision carefully examined the frailties and vulnerabilities of human perception and memory. Id. at 217. The decision surveyed the circumstances that can lead to misidentification, specifying various "estimator" variables (e.g., lighting conditions, distance, the length of time the witness has to observe the perpetrator, stress during an encounter, and cross-racial effects) and "system" variables (i.e., the manner in which police administered a photo array procedure) that influence a witness's ability to accurately identify a culprit. Id. at 247, 289–90.

Especially relevant to the matter before us, the Court stressed, "we must strive to avoid reinforcement and distortion of eyewitness memories from outside effects." Id. at 295. The Court recognized that "[i]nformation received

by witnesses both before and after an identification can affect their memory." Id. at 253.

Henderson established best practices for police to use when administering eyewitness identification procedures. It also stressed the need to instruct juries on the risk of misidentification, mindful that the predecessor standard for assessing eyewitness identification evidence overstated the jury's inherent ability to evaluate evidence offered by eyewitnesses who honestly believe their testimony is accurate. Id. at 218, 296. The Court "asked the Criminal Practice Committee and the Committee on Model Criminal Jury Charges to draft proposed revisions to the . . . model charge on eyewitness identification and address various system and estimator variables." Id. at 219. Pursuant to the Court's request, a comprehensive model jury charge was drafted to explain to juries the risk of misidentification and to highlight certain specific circumstances that may affect the reliability of an identification. The eyewitness identification charge, drafted in accordance with Henderson and subsequently approved by the Court, is designed to provide guidance to juries in gauging a witness's capacity to testify reliably that the defendant-at-bar is the particular person the eyewitness observed at the scene and time of the crime. See Model Jury Charge (Criminal), "Identification: In-Court and Out-

Of-Court Identifications" (rev. May 18, 2020); see also State v. Anthony, 237 N.J. 213, 228–29 (2019).

Importantly for purposes of this appeal, Henderson eschewed a categorical, per se rule that would require suppression whenever police employ a suggestive procedure. The Court explained,

> [t]he framework avoids bright-line rules that would lead to suppression of reliable evidence any time a law enforcement officer makes a mistake. Instead, it allows for a more complete exploration of system and estimator variables to preclude sufficiently unreliable identifications from being presented and to aid juries in weighing identification evidence.
>
> [Id. at 303.]

The Court added,

> [w]e also expect that in the vast majority of cases, identification evidence will likely be presented to the jury. The threshold for suppression remains high. Juries will therefore continue to determine the reliability of eyewitness identification evidence in most instances, with the benefit of cross-examination and appropriate jury instructions.
>
> [Ibid.]

The Court also retained the general rule that, "the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification." Id. at 289 (citing Manson v. Brathwaite, 432 U.S. 98, 116 (1977) and State v. Madison, 109 N.J. 223, 239 (1988)). The issue of

reliability is to be decided by an examination of the totality of the circumstances. Henderson, 208 N.J. at 289.

The Henderson opinion focuses on out-of-court identification procedures, not in-court identifications. It is well-established, however, that trial courts may preclude a witness from making an in-court identification based on events that occurred before trial. In Guerino, we recognized that "[s]uppression of an out-of-court identification procedure . . . is not the only potential remedy for an impermissibly suggestive procedure that has the potential to corrupt a witness's memory. Such a procedure could also place at risk the admissibility of a subsequent in-court identification." 464 N.J. Super. at 613–14.

The decision to prohibit an in-court identification is made on a case-by-case basis. See State v. Madison, 109 N.J. at 242 (emphasis omitted) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)) (holding an in-court identification is not admissible if a "photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"). Determining the admissibility of an eyewitness's in-court identification entails a two-step process. As the Court explained in Madison, "a court must first decide whether the procedure in question was impermissibly suggestive. If the court does find the procedure

37                                                                A-1342-18

impermissibly suggestive, it must then decide whether the objectionable procedure resulted in a 'very substantial likelihood of irreparable misidentification.'" 109 N.J. at 232 (quoting Simmons, 390 U.S. at 384). "In carrying out the second part of the analysis, the court will focus on the reliability of the identification. If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence." Ibid. The issue of reliability is to be decided by an examination of the totality of the circumstances. Id. at 233.

## C.

We next consider whether, applying existing principles governing the use of in-court identifications, defendant's trial convictions must be reversed because Rosette's in-court identification was tainted by information Detective Alfonso provided to her immediately after she identified her watch in the photographs that had been extracted from defendant's phone.

In this instance, the police interaction with the victim, claimed to be impermissibly suggestive, was not a typical identification procedure within the meaning of Henderson. The suggestive police conduct did not occur during a photo array session. Rather, the suggestive information relayed by police to Rosette occurred during a later meeting at which she confirmed that her watch

A-1342-18

was depicted in the photographs. Her identification of her own watch was, without question, reliable. The problem now before us arose when Detective Alfonso told her not only that the photographs of the watch had been extracted from defendant's cell phone, but also disclosed defendant's name.

This is an unusual situation. The detective did not show Rosette a photograph of defendant. Rather, he mentioned defendant's name as the person who had been arrested for the robbery and from whose phone the watch photos had been extracted.

The record is clear that Rosette had interacted with defendant on two occasions prior to the robbery and had, during the course of the robbery, recognized him as the brother of the contractor who did repair work on her house. Those prior interactions lend support to the State's argument that her in-court identification was based on an independent recollection of defendant. We are nonetheless satisfied that the information provided to her by Detective Alfonso as to the source of the cellphone photographs was suggestive in that it had the capacity to influence her recollection and thereby impact her in-court identification. Indeed, Rosette candidly acknowledged that her in-court identification was in fact influenced by a deduction she drew from the information provided by Detective Alfonso. That circumstance was thus fully presented to the jury through skillful cross-examination. Accordingly, there

A-1342-18

was little danger that the jury might "overstate[] [its] inherent ability to evaluate evidence offered by eyewitnesses who honestly believe their testimony is accurate." Henderson, 208 N.J. at 218.

In sum, we believe the trial court did not abuse its discretion in ruling that any unreliability in Rosette's in-court identification as a result of the information conveyed to her by Detective Alfonso would be better addressed to the jury by way of cross-examination and appropriate instructions. Considering the totality of these unusual circumstances, we agree with the trial court that defendant did not meet the high standard required for suppression—"a very substantial likelihood of irreparable misidentification." Guerino, 464 N.J. Super. at 622–23 (quoting Henderson, 208 N.J. at 289).

We also conclude that the jury instructions were adequate.[13] The judge gave an appropriately tailored jury instruction that (1) noted that Rosette made an in-court identification in February 2018, (2) noted that Rosette failed to make an out-of-court photo array identification in December 2015, and (3) reiterated that the jurors were the ultimate finders of fact and that the trustworthiness of the witness identification was for them to decide.

---

[13] See supra note 12 (recognizing that defendant's argument concerning the jury instruction focuses on the suggestibility of the police conduct before the in-court identification, and therefore declining to address the inherent suggestibility of in-court identifications).

Finally, we add that even if the in-court identification had been suppressed, Rosette would still have identified her watch from the photographs stored on defendant's cell phone. Some of those photographs were taken at the same time the robbery was occurring. In view of the overwhelming evidence that defendant was the robber, even assuming for the sake of argument that Rosette's in-court identification should have been suppressed, any such error was not capable of producing an unjust result. R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is such a nature as to have been clearly capable of producing an unjust result . . . .").

To the extent we have not addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed in part and remanded in part for further proceedings consistent with section II of this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1342-18